## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

2013 JAN 24  PM 2: 35

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

|  |  |
|---|---|
| PAIN CENTER OF SE INDIANA, LLC INDIANA PAIN MEDICINE AND REHABILITATION  CENTER, P.C. and ANTHONY ALEXANDER, M.D., | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ORIGIN HEALTHCARE SOLUTIONS LLC and SSIMED, LLC, | ) ) ) ) |
| Defendants. | ) |

Cause No.:

**1: 13 -cv- 0 1 3 3 RLY -DKL**

### COMPLAINT

Comes now the Plaintiffs, Pain Center of SE Indiana, LLC, Indiana Pain Medicine and

Rehabilitation Center, and Anthony Alexander, M.D. in the above-styled cause and files this

Complaint against Origin Healthcare Solutions LLC, successors in interest to SSIMED, LLC,

predecessors.  In support of same, the Court is shown as follows:

### I. **PARTIES**

1.  Plaintiff Pain Center of SE Indiana, LLC was an Indiana limited liability company

with its principal place of business in Seymour, Indiana.

2.   Plaintiff Indiana Pain Medicine and Rehabilitation Center, P.C. is an Indiana

corporation with its principal place of business in Seymour, Indiana.

3.  Plaintiff Alexander is a resident of Indiana, residing in Jeffersonville, Indiana.

4.  Defendant SSIMED, LLC was a limited liability company with its principal place of

business located at 835 Bloomfield Avenue, Windsor, Connecticut 06095.  Upon information

and belief, Defendant SSIMED, LLC is a predecessor in interest to Origin Health Care Solutions, LLC.

5. Defendant Origin Health Care Solutions LLC f/k/a SSIMED, LLC is a limited liability company with its principal place of business located 835 Bloomfield Avenue, Windsor, Connecticut 06095.

## II. JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this Action under 28 U.S.C. §1332. Plaintiffs are citizens of Indiana and Defendants are citizens of Connecticut. As the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interests and costs, the Parties are diverse. Plaintiffs seek compensatory damages in excess of Ten Million Dollars ($10,000,000.00), as well as punitive damages. In addition, this Court maintains federal question jurisdiction pursuant to 28 U.S.C. §1332.

7. Venue is proper as Defendants are foreign corporations organized under the laws of the State of Delaware with a principal place of business in Windsor, Connecticut. Upon information and belief, Defendant Origin Health Care Solutions LLC is a successor company to SSIMED, LLC and may be served with process through its registered agent pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this Action occurred in this judicial district.

8. The Defendants are subject to personal jurisdiction because they are engaged in substantial and not isolated activities within this State and such jurisdiction does not violate the Due Process Clause of the Fourteenth Amendment.

## III. **BACKGROUND**

### A. EHR's

9.  Over the years, the use of Electronic Health Records (EHRs) in the United States has helped improve patient care by streamlining documentation and workflow.  The proliferation of EHR companies allowed practitioners software that covered many areas of practice management and clinical tasks including registration, billing, appointment scheduling and collections.

10.  On or about February 17, 2009, the President signed into law a $789 Billion Dollar federal economic stimulus package, formerly known as the American Recovery and Reinvestment Act ("ARRA").  Within this legislative framework, included the Health Information Technology for Economic and Clinical Health ("HITECH") Act.  HITECH allocates $19 Billion Dollars to hospitals and physicians who demonstrate "meaningful use" of electronic health records ("EHRs").  Congress, in an effort to help improve Americans' health, increased safety and privacy in the healthcare industry, and reduce healthcare costs, allowed eligible professionals using certified EHR technology to qualify for incent payment under the Medicare/Medicaid EHR Incentive Programs of up to $44,000 under Medicare and $63,750 under Medicaid.  In Health Professional Shortage Areas, additional incentives were available. As a result, the utilization of EHR companies continues to expand.

### B. The Origin/SSIMED Defendants

11.  Upon information and belief, SSIMED, LLC, a predecessor in interest to Origin Health Care Solutions LLC, was a limited liability company with its principal place of business in Windsor, Connecticut.  It was established in 1991 as an electronic health record vendor and provider of physician software and services, claiming to offer software solutions to help make

3

the business end of the medical practice easier, including, *inter alia*, software for medical claim coding, patient appointment tracking and medical insurance billing.

12.  In essence, SSIMED LLC's products offered "the promise of efficiency.  Speedier reimbursements.   A   turn-key   approach   to   rules   and   regulations."    See www.://healthcare.intuit.com/portal/press-release/origin-healthcare-solutions-advanced-functionality.jsp.  Upon information and belief, SSIMED, LLC specifically targeted solo private medical practices, large medical specialty groups, and hospital-based medical practices with the product, "Practice Manager", that served as a billing software package which would allow the processing claims utilizing clinical documentation software.   And in 2006, SSIMED, LLC developed "EMRge", a clinical data software package, so that together with "Practice Manager" , the two packages could work seamlessly together.   Ultimately, this software was sold to customers located in various states.

13.  Plaintiffs had originally contracted with SSIMED, LLC which later became Origin Health Care Solutions LLC.  In this Complaint, the Defendants are hereinafter collected referred to as "Origin".

14.  According to Origin's website, it serves more than 54,000 providers, which includes solo private practices, large specialty groups and hospital-based practices.  In addition, it claims it software is "designed to make the business end of their [customers] work easier.  From fitting patients in for follow-up appointments, to making sure claims are coded correctly."  The website also explains, that after a decade of success in full-service integrated billing, "[C]lients who use this service get the benefit of our software as well as the tact and professionalism of our staff." The software is marketed as being instrumental to increasing physician productivity as well as being easy to install, simple to use, and very efficient.   The website also states the following:

"High-tech can never replace people when questions, problems or challenges arise. So we're still a company that invests countless hours in customer support. Call us during regular hours and you won't get a canned cyber-message, you get the right answers from experts who are friendly and knowledgeable."

## IV. FACTS COMMON TO ALL COUNTS

15. At all relevant times hereto, Plaintiffs Indiana Pain Medicine and Rehabilitation Center, P.C., Pain Center of SE Indiana, LLC, and Dr. Anthony Alexander (collectively referred to as "Plaintiffs"), operated a privately-owned outpatient medical clinic incorporated under the laws of the State of Indiana with its principal place of business in Seymour, Indiana.

### A. Initial Communications (2003)

16. On or about June 2003, Plaintiffs entered into discussions with Origin (f/k/a/ SSIMED LLC) regarding the possible purchase of certified EHR software which would meet relevant certifications and compatibility with Plaintiffs existing software and hardware.

17. On or about 2003, Origin sales representatives misrepresented to Plaintiffs that certain costs associated with the implementation and maintenance of its existing package were substantially higher than similar costs for implementing and maintaining the "SSIMED Practice Manager Suite: including Practice Manager and Scheduler." For example, Origin represented that it would provide a seamless transition to a new software package because it had substantial experience in anesthesia and pain management billing. Origin represented that it had represented dozens of interventional pain medicine practices similar to ours and that it had incorporated its software package without error. Origin represented that none of the other interventional pain medicine practices had experienced any problems with claims reimbursements and that it would ensure that if Plaintiffs decided to purchase said software, that due to its expertise and personnel,

it could ensure Plaintiffs would have no such problems either. In reality, the cost to switch to Origin's software package was substantially higher. These misrepresentations led to Plaintiffs purchasing for the Origin software and services.

18. On or about June 2003, Origin sales representatives advised Plaintiffs as to the alleged capabilities and effectiveness of Origin's "practice management" software and demonstrated the software did not possess "glitches" which would result in bills not being properly submitted to the insurance companies and that due to its support eventually sold to Plaintiffs, and experience in billing similar practices, it had the capacity to prevent or rectify reimbursement issues caused by the user or Origin software prior to Plaintiffs incurring losses and would in fact do so. The representatives misrepresented that Plaintiffs should expect the same results if they purchased the software and support services.

19. When specifically asked Dr. Alexander whether there had been negative feedback provided regarding their products, the Origin sales representatives reported they had not experienced negative feedback regarding their software and/or services.

20. When specifically asked Dr. Alexander, if Origin, through its customer support, had the capability to quickly promptly diagnose, and correct problems that may interfere with Plaintiff's billing efforts, it assured that it did and that such support would be included via the software services and support package Dr. Alexander ultimately purchased.

21. Based on the foregoing willful and wanton recommendations, misrepresentations and and material omissions, Plaintiffs agreed to abandon its existing software package in favor of the Origin software entitled "SSIMED Practice Manager Suite: including Practice Manager and Scheduler" and services thereto.

## B. <u>Agreement 1 (2003)/Subsequent Failure to Perform</u>

22.   Based on the foregoing willful and wanton recommendations, misrepresentations, materials omissions and fraudulent acts made and committed by Origin's representatives, Plaintiffs entered a contract with Origin for the purchase of the SSIMED "Practice Manager Suite: including Practice Manager and Scheduler" and support services thereto.   A true and correct copy of the first Software SSIMED Licensing Agreement (hereinafter, "Agreement 1") is attached to this Complaint and incorporated herein as Exhibit A.  The Origin software went "live" shortly thereafter meaning Plaintiffs begin actively using and incorporating the Origin software into its ordinary course of business.

23.   Pursuant to the Parties' agreement, Origin insured the successful implementation of its software by providing, *inter alia*, the appropriate version of Origin software, adequate training for its users, a support team to address and guide each stage of implementation as well as resolve any errors and issues with the Origin software as they arose so that Plaintiffs  patient records would be accurate and complete and billing services would allow for prompt reimbursement from third party payors including Medicare/Medicaid and various insurance companies. In addition, Origin represented that based on the M-F 8am-5pm EST availability of its personnel, any problem that Plaintiffs had with its software would be rectified within 24 hours.  If such problems were not rectified by phone during that time, Origin would send personnel to Plaintiffs' site within 72 hours to resolve any outstanding issues.  Origin failed to perform any of their obligations in this regard and each of the related representations were untrue, however when Plaintiff called regarding software related issues, Origin assured that despite its actions, Plaintiffs reimbursements had been timely processed and no clinical data was lost.  Other times, Origin personnel were completely unavailable.

24.   Shortly after entering this agreement, the software began exhibiting errors such as displaying incorrect information, displaying faulty recording of patient information, loss of data, etc.

25.   After entering into said agreement, Plaintiffs began noticing that they had not received reimbursements from either the government or insurance companies despite having presented claims for payment through the use of Origin's software.

26.   After Plaintiffs contacted Origin inquiring about the discrepancy between bills submitted and accounts receivable, Origin's support staff and/or agents indicated that according to their records, and system tests, the problems experienced by Plaintiffs in this regard had nothing to do with its software or services; or interface with the exchange, thereby fraudulently concealing the defects in its software and services.  Origin also reiterated that such discrepancies were not the result of any failures by the Plaintiffs including the failure to seek and/or obtain the necessary on-site support, hardware services or support, non-standard upgrades/custom programming, networking, or operating system support, enter the correct codes, but rather the insurance companies decision to decline the submitted bills. Furthermore, Origin represented that claims that were never presented to the insurance companies had been declined.  For example, Plaintiffs submitted claims for a patient seen on 3/3/04 and 3/11/04 and Origin software reflected a "successful" transaction even when this was not the case and Origin personnel represented this indicated the claims had been properly presented to third party payors.  Plaintiffs did reasonably rely on these representations to their detriment.

27.   As a result of Origin's representations, software and services, Plaintiffs' employees continued to "resubmit" bills that were never presented to the insurance companies or third party payors.

28. As a result of Origin's representations, software, and services, Plaintiffs engaged in a vicious cycle of borrowing from banks and friends to cover financial shortfalls that should have been taken care of by income generated by the corporation as well as loose personnel.

29. Problems with Origin's products and services were exacerbated by inadequate training of employees and other intended users of the Origin software as the relevant Origin employees lacked sufficient experience or knowledge to provide the necessary training or address the problems encountered throughout Plaintiffs use of the software, however, Plaintiffs were misled to believe the software and their services were not the cause of Plaintiffs damages and that the training provided to Origin personnel as well as Plaintiffs was indeed sufficient.

30. Plaintiffs were forced to turn their attention away from the primary goal of seeing patients in order to focus on the damages, unknown at the time, caused by Origin's failure to perform according to their agreement, which also resulted in Plaintiffs experiencing both economic and non-economic losses, including physical and emotional distress.

## C. Communications Prior to Agreement II (2006)

31. On or about November 2006, Origin engaged Plaintiffs into discussions regarding purchasing additional software and services. Plaintiffs entered into further discussions with Origin regarding the possible purchase of certified EHR software which would serve as a tremendous upgrade to Plaintiffs' existing software and hardware.

32. On or about November 2006, Origin represented to Plaintiffs that its product "EMRge" was a revolutionary product that would again allow for expedient billing reimbursement and patient record management as well as an upgrade to Plaintiffs current system when coupled with the billing software. Specifically, Origin represented that "EMRge" was specifically designed to work well with "Practice Manager" and had been extensively tested in

this regard by many other interventional pain medicine practices, while admitting to Plaintiffs that it had experienced those earlier problems due to the fact that it was using a different clinical data software; thus by utilizing "EMRge", this problem would be eliminated. Furthermore, Origin indicated that if Plaintiffs did not switch to "EMRge" that "Practice Manager" would not function as efficiently, however, Origin assured that all of the previous claims had been properly submitted to third parties as opposed to rejected by the exchange system. These misrepresentations eventually led to Plaintiffs subsequently purchasing for the additional software "EMRge" and monthly support services thereto.

33. On or about November 2006, Origin represented at Plaintiffs principal place of business, the alleged capabilities and effectiveness of Origin's practice management software and attested that this latest software package did not possess "glitches" which would result in bills not being properly submitted to the insurance companies. The representatives misrepresented that Plaintiffs should expect the same results, and even if such problems were to occur, due to the support services eventually sold to Plaintiffs, and experience dealing with similar practices, it had the capacity to timely prevent and/or rectify such problems whether such were caused by user error or software malfunctioning for reimbursement purposes and would in fact do so.

34. When specifically asked by Dr. Alexander whether there had been negative feedback provided regarding the combination of "EMRge" and "Practice Manager", the Origin sales representatives reported they had not experienced negative feedback regarding their software and/or services.

35. When specifically asked by Dr. Alexander, if Origin, through its customer support, had the capability to quickly promptly diagnose, and correct problems that may interfere with

Plaintiff's billing efforts, it assured that it did and that such support would be included via the software services and support package Dr. Alexander ultimately purchased.   Origin also represented that it built "EMRge", although upon information and belief, it only licensed EMRge.

36.   Based on the foregoing willful and wanton recommendations, misrepresentations, and material omissions, Plaintiffs did reasonably rely on these representations to their detriment when they purchased such additional Origin software and support services entitled "SSIMED EMRge".

### D.  Agreement II (2006)/Subsequent Failure to Perform

37.   Based on the foregoing willful and wantonrecommendations, misrepresentations, material omissions and fraudulent acts made and committed by Origin's representatives, Plaintiffs entered a second contract (Agreement II) with Origin on or around November 2006 for the purchase of the SSIMED "EMRge" and support services thereto.  A true and correct copy of the first Software SSIMED Licensing Agreement (hereinafter Agreement II) is attached to this Complaint and incorporated herein as Exhibit A.  The Origin software "EMRge" went "live" shortly thereafter, meaning Plaintiffs begin actively using and incorporating the Origin software into its ordinary course of business.

38.   Pursuant to the Parties' new agreement, Origin again insured the successful implementation of its software by providing, *inter alia*, the appropriate version of Origin software consistently, adequate training for its users, accurate billing sheets, a support team to address and guide each stage of implementation as well as resolve any errors and issues with the Origin software as they arose so that Plaintiffs  patient records would be accurate and complete and billing services would allow for prompt reimbursement from third party payors including Medicare/Medicaid and various insurance companies. In addition, Origin represented that based

on the M-F 8am-5pm EST availability of its personnel, any problem that Plaintiffs had with its software would be rectified within 24 hours.   If such problems were not rectified by phone during that time, Origin would send personnel to Plaintiffs' site within 72 hours to resolve any outstanding issues.  Origin failed to perform any of their obligations in this regard and each of the related representations were untrue, however when Plaintiff called regarding software related issues, Origin assured that despite its actions, Plaintiffs reimbursements had been timely processed and no clinical data was lost.   Other times, Origin personnel were completely unavailable.

39.    Shortly after entering this agreement, the software began exhibiting an increased frequency of errors with respect to displaying incorrect information, displaying faulty recording of patient information, and loss of data etc.  The software programs were never updated on a consistent basis as promised, and when the software was updated it would cause the system to crash. The billing sheets were never corrected as promised either and contained many out-of-date billing codes despite Plaintiffs' request to correct such.   When patient files were saved, there would be periods the data was lost.  Noticeably, the software problems were exacerbated by the integration of "EMRge" and "Practice Manager".

40.    After entering into said agreement, Plaintiffs began noticing that they had not received reimbursements from either the government or insurance companies despite having presented claims for payment through the use of Origin's software.

41.    Unbeknownst to Plaintiffs, Origin had represented certain components of the software existed that did not.

42.    After Plaintiffs contacted Origin inquiring about the discrepancy between bills submitted and accounts receivable, Origin's support staff and/or agents indicated that according

to their records, and system tests, the problems experienced by Plaintiffs in this regard had nothing to do with its software or services; or interface with the exchange, thereby fraudulently concealing the defects in its software and services. Origin also reiterated that such discrepancies were not the result of any failures by the Plaintiffs including the failure to seek and/or obtain the necessary on-site support, hardware services or support, non-standard upgrades/custom programming, networking, or operating system support, nor user error, but rather the insurance companies decision to decline the submitted bills. Furthermore, Origin represented that claims that were never presented to the insurance companies had been declined by such companies. For example, Plaintiffs submitted claims for a patient seen on 3/1/2012 and 6/14/2012 and Origin software reflected a "successful" transaction even when this was not the case and Origin personnel represented this indicated the claims had been properly presented to third party payors. Plaintiffs did reasonably rely on these representations to their detriment.

43. On another occasion, during the term of this agreement, Plaintiffs received software upgrades from Origin in order to be eligible for stipends related to the aforementioned "meaningful use" incentives associated with the proper utilization of electronic health records. Following this, according to Origin, everything was in place to receive the associated stipends so long as Plaintiffs utilized its software in accordance with their instructions.

44. Despite acquiring Origin's recommended software upgrade, Plaintiffs found several errors relating to the same. For example, there were clear deficiencies in the smoking cessation criteria. In response to Plaintiffs' inquiry regarding why it had not been given its stipend for having demonstrated "meaningful use" of electronic health records, Origin informed that Plaintiffs needed a "meaningful use" webinar that was not scheduled until at or around January 25, 2012, well after Plaintiffs suffered damages. On one occasion, after Origin realized that it

did not have the platform, as represented, that would allow Plaintiffs to receive reimbursements, it informed Plaintiffs that it would simply "take care of it" which meant that it would unilaterally enter patient data for the purpose of reimbursement.

45.  At or around the time of this webinar, Plaintiffs learned that there was a further problem with the software.  Based on a recommendation from Origin personnel, a 10 year "submission history" report generated only $21.9 Million Dollars despite clinical visit numbers which justified well in excess of $30-36 Million Dollars. When the numbers were re-run, Origin's software had been manipulated to run three different sets of numbers within a 36-hour period-first, $21.9 Million Dollars; second $16 Million Dollars and finally $21.6 Million Dollars.

46.  When Mr. Frank Riccio, a President of Origin Health Solutions LLC, was informed of the severe software problem as well as the manipulation of different submission history numbers, Mr. Riccio cavalierly responded that everything could be explained by referring to the "Client Center".  Plaintiff, having never heard of the "Client Center" much less trained on it, informed Riccio of the same, and he insisted Plaintiffs were lying.

47.  Following complaints made to Origin, Plaintiffs witnessed further evidence of Plaintiffs records and submission histories being manipulated by Origin.  For example, Plaintiffs learned of fraudulent recording of "client center" histories just days after communications with Mr. Riccio.

48.  Only after being confronted with the clear evidence that nearly 1/3 of Plaintiffs submitted claims never reached the intended Third Party Payors, and millions of dollars later, did Origin make such admission (March 2012).

49.  Still, in reliance of additional direct instructions from Origin personnel, there was no receipt of "meaningful use" incentive payments until Plaintiffs deviated from Origin's protocol.

50. When Plaintiffs confronted Origin regarding the foregoing issues, Plaintiffs were met with disregard, apathy, and provocation.  Instead of making a good faith attempt to resolve the issues described in this Complaint, Defendants purposely lied to Plaintiffs regarding how they experienced significant shortfall of revenues caused by Origin's services, software, and conduct.

51.   Problems with Origin's products and services were exacerbated by inadequate training of employees and other intended users of the Origin software as the relevant Origin employees lacked sufficient experience or knowledge to provide the necessary training or address the problems encountered throughout Plaintiffs use of the software which often led to representations to Plaintiffs that Origin's software and services were not the cause of Plaintiffs' damages.

52. As a result of Origin's representations, software, and services, Plaintiffs' employees continued to "resubmit" bills that were never presented to the insurance companies or Third Party Payors.

53. As a result of Origin's representations, software, and services, Plaintiffs continued to engage in a vicious cycle of borrowing from banks and friends to cover financial shortfalls that should have been taken care of by income generated by the corporation as well as loose personnel.

54. As a result of Origin's conduct, software and services, Plaintiffs were forced to turn their attention away from the primary goal of seeing patients in order to focus on the damages caused by Origin's failure to perform according to their agreement, which also resulted in Plaintiffs experiencing both economic and non-economic losses, including physical and emotional distress.

## COUNT I – FRAUD

55.  Plaintiffs incorporate by reference, as if fully set forth herein, the allegations set forth in each preceding paragraph and further alleges as follows:

56.  Origin representatives intentionally made false and misleading representations to Plaintiffs regarding the characteristics and services associated with Origin software.  Origin made material representations to Plaintiffs personnel regarding the functional capacity of Origin's software and services just prior to both contracts and during the entire course of their relationship.  For example, Origin represented prior to and subsequent to both Agreements that its software would fluidly interface with all of Plaintiffs existing software and hardware.  In doing so, Origin stated that once the system went "live," Origin would timely address any deficiencies in the system as they appeared so that Plaintiffs would not suffer any loss of revenues as a result of utilizing their products and services due to its capacity to prevent such problems; that Origin had significant experience with interventional pain medicine practices; that the software and services that Plaintiffs ultimately purchased would and did have the capacity to timely alert Plaintiffs and Origin to recapture claims improperly submitted to the insurance company prior to loss of revenue; that tests had been performed ensuring claims that had never been submitted to the insurance companies were rejected by the same; that "EMRge" had been built by Origin although upon information and belief it had only been licensed by Origin, and that claims labeled as "successfully transmitted" indicated that the claims were received by the insurance company.  Origin also ensured its billing sheets were accurate and were regularly updated for inaccuracies.

57.  Unbeknownst to Plaintiffs, Origin had advertised to Plaintiffs software and services dissimilar from what Plaintiffs purchased.

58.  The representations mentioned directly above and elsewhere in this Complaint were false when Origin made them in that the software and services were not remotely close to what Origin had represented them to be under either agreement.  As a result, Origin's software and services failed to allow for efficient and accurate processing of reimbursements or meet EHR requirements under Agreements 1 or II, or timely receive reimbursements from the Medicare/Medicaid Incentive Program payments under Agreement II while relying on Origin's support and services.

59.  Origin knew the representations were false when it made them, or they made them with reckless disregard for their truth or falsity, in that Origin knew or should have known the software it sold to Plaintiffs did not meet EHR requirements, nor did it interface with appropriately with Plaintiffs existing software or hardware prior to or during either agreement. In addition, Origin was never positioned to correct the problems that it described, and prior to Plaintiffs suffering losses as they asserted prior to either agreement.  Furthermore, Origin represented claims were successfully transmitted beyond just the exchange through its software and its representations when this was untrue.  Additionally, Origin knew or should have known the representations it made to Plaintiffs were patently false in that Origin intended to, and did, sell to Plaintiffs software and services that did not function nor have the capability to do so as represented by Origin personnel.

60.  Origin made the representations mentioned above with the intent and for the purpose of deceiving Plaintiffs and to induce Plaintiffs into relying on the representations for Origin's own pecuniary benefit.

61.    As a proximate result of Origin's aforementioned actions and representations, Plaintiffs entered into both agreements, and reasonably relied on the aforementioned representations.

62.    As a direct and proximate result of the aforementioned actions and false and misleading representations, Plaintiffs suffered substantial pecuniary loss including economic and non-economic damages.

63.    As a direct result of the aforementioned actions and false and misleading representations, Plaintiff lost approximately $10 million in nonsubmitted claims.

64.    As a direct result of the aforementioned actions and false and misleading representations, Plaintiffs suffered lost profits associated with multiple business opportunities. Such opportunities include partnership offer made for Twenty Thousand Dollars ($20,000) in 2010 to be a member of the Metrosurgery in Jeffersonville, Indiana.   Upon information and belief, the distribution of the shares produced Six Hundred Thousand Dollars ($600,000) in 2011 and is on pace to produce Eight Hundred Thousand Dollars ($800,000) in 2012.  This investment would continue as long as Dr. Alexander practiced pain medicine.  But for the direct result of the aforementioned actions and false and misleading representations, Plaintiff would have been a partner of this group and as a result is expected to suffer damages which exceed $20 Million Dollars related to this venture.  But for the direct result of the aforementioned actions and false and misleading representations, Plaintiff would have hired three Interventional Pain Medicine Physicians in 2003, 2006, and 2010.  Because Plaintiffs could not, Plaintiffs suffered a total loss of $35 Million Dollars related to this lost opportunity. But for the direct result of the aforementioned actions and false and misleading representations, Plaintiff had patent rights to a porous Neurostimulator Lead and is expected to suffer an unknown loss related to this lost

opportunity at this time but to be proven at trial.  But for the direct result of the aforementioned actions and false and misleading representations, Plaintiffs could not complete the Ambulatory Surgery Center deal in 2005, or 2010 and is expected to suffer a $25 Million Dollar loss related to this lost opportunity. But for the direct result of the aforementioned actions and false and misleading representations, Plaintiffs could not complete the MRI center in 2003 or 2010, and suffered a total loss of $21.6 Million Dollars related to this opportunity.

65.  That the foregoing misrepresentations were made willful and wantonly by Origin personnel, and at a minimum, with heedless disregard of their consequences.  Punitive damages are therefore warranted to punish Origin and to deter them and others from engaging in similar conduct.

WHEREFORE, Plaintiffs respectfully requests that Judgment be entered in their favor and against Origin on Count I:  (a) awarding Plaintiffs compensatory damages in excess of Ten Million Dollars ($10,000,00) with the remainder to be proven at Trial;  (b) for prejudgment interest on the foregoing compensatory damages; (c) awarding Plaintiffs punitive damages in an amount sufficient to punish Origin and to deter similar misconduct by them and by others; and, (d) for such additional relief as the Court deems just and proper in the premises.

## COUNT II – FRAUD IN THE INDUCEMENT

66.  Plaintiffs incorporate by reference, as fully set forth herein, the allegations set forth in each preceding paragraph and further alleges as follows:

67.  Origin representatives intentionally made false and mislead representations to Plaintiffs regarding the characteristics and services associated with Origin software.  Origin made material representations to Plaintiffs personnel regarding the functional capacity of Origin's software and services just prior to both contracts and during the entire course of their

relationship. For example, Origin represented prior to and subsequent to both Agreements that its software would fluidly interface with all of Plaintiffs' existing software and hardware. In doing so, Origin stated that once the system went "live," Origin would timely address any deficiencies in the system as they appeared so that Plaintiffs would not suffer any loss of revenues as a result of utilizing their products and services; that Origin had significant experience with interventional pain medicine practices; that the software and services that Plaintiffs ultimately purchased would and did have the capacity to timely alert Plaintiffs and Origin to recapture claims improperly submitted to the insurance companies prior to loss of revenue; that tests had been performed ensuring claims that had never been submitted to the insurance companies were rejected by the same; that EMRge had been built by Origin although upon information and belief it had only been licensed by Origin, and that claims labeled as "successfully transmitted" ensured that the claims were received by the insurance companies.

68. Unbeknownst to Plaintiffs, Origin had advertised to Plaintiffs software and services dissimilar and inferior to that which Plaintiffs purchased.

69. Origin knew at the time it made these representations to Plaintiffs, that those representations were false.

70. Origin made these representations for the purpose of inducing Plaintiffs to purchase the Origin Software and services so they would enter into the Agreements (Agreements I and II).

71. Plaintiffs did not know that Origin's representations were false and it did so reasonably rely on those representations in deciding to switch and maintain Origin's software and services.

72.     Because Plaintiffs did not know that Origin's representations were false and misleading, Plaintiffs and Origin entered into two contracts (Agreements 1 and II), for the purpose of Plaintiffs obtaining software Origin represented to have certain characteristics.

73.     As a direct result of the aforementioned actions and false and misleading representations, Plaintiff lost approximately $10 Million Dollars in nonsubmitted claims.

74.     As a direct result of the aforementioned actions and false and misleading representations, Plaintiffs suffered lost profits associated with multiple business opportunities. Such opportunities include partnership offer made for Twenty Thousand Dollars ($20,000) in 2010 to be a member of the Metrosurgery in Jeffersonville, Indiana. Upon information and belief, the distribution of the shares produced Six Hundred Thousand Dollars ($600,000) in 2011 and on pace to produce Eight Hundred Thousand Dollars ($800,000) in 2012. This investment would continue as long as Dr. Alexander practiced pain medicine. But for the direct result of the aforementioned actions and false and misleading representations, Plaintiff would have been a partner of this group and as a result is expected to suffer damages which exceed Twenty Million Dollars ($20,000,000) related to this venture. But for the direct result of the aforementioned actions and false and misleading representations, Plaintiff would have hired three Interventional Pain Medicine Physicians in 2003, 2006, and 2010. Because Plaintiffs could not, Plaintiffs suffered a total loss of Thirty-Five Million Dollars ($35,000,000) related to this lost opportunity. But for the direct result of the aforementioned actions and false and misleading representations, Plaintiffs had patent rights to a porous Neurostimulator Lead and is expected to suffer an unknown loss related to this lost opportunity at this time but to be proven at trial. But for the direct result of the aforementioned actions and false and misleading representations, Plaintiffs could not complete the Ambulatory Surgery Center deal in 2005, or 2010 and is expected to

suffer a Twenty-Five Million Dollar ($25,000,000) loss related to this lost opportunity. But for the direct result of the aforementioned actions and false and misleading representations, Plaintiffs could not complete the MRI center in 2003 or 2010, and suffered a total loss of $21.6 Million Dollars related to this opportunity.

75.   As a direct and proximate result of Origin's misrepresentations, Plaintiffs have suffered damages in an amount in excess of Ten Million Dollars ($10,000,000) in connection with the utilization of the Origin software and support service.

76.   Origin made the foregoing misrepresentations willfully and wantonly, and at a minimum, with heedless disregard of their consequences.   Punitive damages are therefore warranted to punish Origin and to deter it and others from engaging in similar conduct.

WHEREFORE, Plaintiffs respectfully requests that Judgment be entered in their favor and against Origin on Count II:  (a) rescinding the Agreements (I and II) as written on the basis of Origin's fraudulent inducement of those agreements; (b) ordering Origin to restore to Plaintiffs all monies paid by Origin in connection with the Agreements (I and II), plus interest; (c) declaring that Origin nor Plaintiffs have any further rights or obligations under the now-rescinded Agreements (Agreement I and II); (d) awarding Plaintiffs compensatory in excess of Ten Million Dollars ($10,000,000) with the remainder to be proven at Trial; (e) awarding Plaintiffs punitive damages against Origin in an amount sufficient to punish it and deter similar conduct by Origin and others; and, (f) for such additional relief as the Court deems just and proper in the premises.

## COUNT III – BREACH OF CONTRACT AGAINST ORIGIN

77.  Plaintiffs incorporate by reference, as if fully set forth herein, the allegations in each preceding paragraph and further alleges the following:

78. Plaintiff fully performed under the contracts, or were excused by Origin's material breaches from performing all of its obligations under the Agreements (I and II).

79. Origin's obligations under both contracts included, *inter alia*, unlimited monthly telephone support during normal business hours, on-line support, daily system polling functions, unlimited electronic claim submission to Medicare, BC/BS, Medicaid, and all payers with the Envoy-NEIC9® Network as well as all standard software upgrades and enhancements. Additionally, under both contracts, Origin represented to Plaintiffs that it would have software with functionally capable features and characteristics and that the support services Plaintiffs purchased would troubleshoot problems as they arose in such a way as to prevent Plaintiffs from suffering losses attributable to software malfunctioning in the claims reimbursement process or user error.

80. Origin breached the agreement under both contracts by failing to meet any of its aforementioned obligations.

81. Origin further breached the Agreements (I and II) by failing to provide adequate training for users and its own personnel in order to prevent either from failing to effectively trouble shoot errors as they arose.

82. Both Agreements (I and II), carried an implied duty to provide its services in a skillful, careful and workmanlike manner.

83. Origin materially breached both Agreements (I and II) by failing to provide unlimited-toll free telephone support during normal business hours, on-line support, daily stem polling functions, unlimited electronic claim submission to Medicare, BCBS, Medicaid, and all payers with the Envoy-NEIC® network, as well as standard software upgrades and enhancements in a skillful, careful, and workmanlike manner. For example, during the span of

time which covered both Agreements (I and II), Plaintiffs made phone calls during normal business hours which went unanswered. In addition, Plaintiffs were not provided adequate on-line support and as a result often had to reurge the same issues to Origin. Similarly, daily system polling functions did not occur, nor did Origin effectively perform the aforementioned upgrades or unlimited electronic claim submission as promised.

84. Origin materially breached both Agreements (I and II) by failing to provide the software as represented to Plaintiffs.

85. Origin materially breached both Agreements (I and II), and upon information and belief, it switched without notice from the Envoy-NEIC® Network to its own in-house network.

86. As a direct and proximate result of Origin's material breaches of both Agreements (I and II), Plaintiffs have suffered damages in excess of Ten Million Dollars ($10,000,000) in connection with the purchase and failed support of Origin's software and services as well as other consequential, punitive, and indirect damages to be proven at Trial.

WHEREFORE, Plaintiffs respectfully requests that Judgment be entered in its favor and against Origin on Count III: (a) awarding Plaintiffs compensatory damages in excess of Ten Million Dollars ($10,000,000) with the remainder to be proven at Trial; (b) consequential and indirect damages to be proven at Trial (c) for prejudgment interest on the foregoing compensatory and consequential and indirect damages; and, (d) for such additional relief as the Court deems just and proper in the premises.

## COUNT IV – BREACH OF CONTRACT/IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING AGAINST ORIGIN

87. Plaintiffs hereby allege and adopt fully each every preceding paragraph as set forth herein and alleges as follows:

88.   In addition to its express terms, the Parties Agreements (I and II), includes an implied covenant of good faith and fair dealing.

89.   The implied duty of good faith and fair dealing required Origin to make good faith attempts in honoring its obligations yet it failed to do so.

90.   In entering into both Agreements (I and II) for the purchase of Origin software, and support services, Origin breached its implied duty of good faith and fair dealing.   For example, during the course of both Agreements (I and II), Plaintiffs were misrepresented by Origin personnel that there were no software or hardware "glitches" at play that could explain why the accounts receivables did not match the clinical volume.   Conversely, Origin routinely misrepresented to Plaintiffs that the claims had been "successfully transmitted" to all of the relevant payors even when this was inaccurate.   During the course of the Agreements, unknown to Plaintiffs, Origin had the capability of unilaterally altering the claims submission history data and did in fact do so to Plaintiffs' detriment.

91.   Origin intentionally deceived Plaintiffs by making the foregoing representations.

92.   Plaintiffs purchased Origin's software and support which were a mere "shell" of what Origin represented, and maintained such over several years based on the ongoing misleading representations made by Origin.

93.   As a direct and proximate result of Origin's breach of the implied duty of good faith and fair dealing under both Agreements (I and II),  Plaintiffs suffered damages in excess of Ten Million Dollars ($10,000,000) in connection with the purchase and failed support of Origin's software and services, as well as other consequential and indirect damages to be proven at Trial.

WHEREFORE, Plaintiffs respectfully requests that Judgment be entered in its favor and against Origin on Count IV:  (a) awarding Plaintiffs compensatory damages in excess of Ten

Million Dollars ($10,000,000) with the remainder to be proven at Trial; (b) consequential and indirect damages to be proven at Trial; (c) for prejudgment interest on the foregoing compensatory and consequential and indirect damages; (d) punitive damages to punish and deter others from similar conduct; and, (e) for such additional relief as the Court deems just and proper in the premises.

## COUNT V – UNJUST ENRICHMENT

94.   Plaintiffs hereby allege and adopt fully each every preceding paragraph as set forth herein and alleges as follows:

95.   In connection with the Origin software and services described in this Complaint, Plaintiffs paid Origin an amount to be proven at Trial.

96.   Plaintiffs' payments to Origin were a specific benefit conferred upon Origin.

97.   The acceptance and retention by Origin of the benefit conferred on it were under such circumstances that it would be inequitable for Origin to retain the benefit, because Origin was unjustly enriched by Plaintiffs' payments in connection with Origin's software and services.

98.   As a direct and proximate result of Origin's conduct, Plaintiff's seeks reimbursement in an amount to be proven at Trial.

WHEREFORE, Plaintiffs respectfully requests that Judgment be entered in its favor and against Origin on Count V:   (a) disgorging Defendant of ill-gotten gains; (b) for prejudgment interest on the foregoing disgorgement; (c) punitive damages to punish and deter others from similar conduct; and, (d) for such additional relief as the Court deems just and proper in the premises.

## COUNT VI – BREACH OF WARRANTIES

99. Plaintiffs hereby allege and adopt fully each every preceding paragraph as set forth herein and alleges as follows:

100. Defendant by and through the sale of the "SSIMED: Practice Manager and Scheduler" and SSIMED "EMRge", and its components, to Plaintiffs, impliedly warranted that the system and its components were fit for the purpose for which they intended. In purchasing the system, Plaintiffs relied on Origin's skill and judgment and the implied warranty of fitness for the purpose which Plaintiffs purchased the product and its necessary components, to have a paperless medical record system and efficient billing system to receive, *inter alia,* reimbursements for Plaintiff's services. Contrary thereto, however, the electronic medical records system to be provided under both agreements were not fit for its intended use. Consequently, Origin's breach of the electronic medical records system, and its components, implied warranty of fitness is a proximate cause of Plaintiffs' damages.

101. Origin also impliedly warranted that the electronic medical records system to be provided under both agreements was of merchantable quality, fit, and in proper condition for the ordinary use for which such systems, and its components were designed to be used for, as a software system designed specifically for an interventional pain medicine specialist medical practice and its healthcare provider. Plaintiffs purchased the electronic medical records system ("Practice Manager" and "EMRge") and other applications with said system, in reliance on Origin's implied warranty of merchantability. Contrary thereto, the electronic medical records systems ("Practice Manager" and "EMRge") were unfit and inoperable and not of merchantable quality for Plaintiffs' medical practice. Origin's breach of the electronic medical records system's implied warranty of merchantability, is a proximate cause of Plaintiff's damages.

102.   As a direct and proximate result of Origin's breach of warranties, Plaintiffs' suffered damages in an amount of Ten Million Dollars ($10,000,000) in connection with the failure of Origin software and services, as well as other consequential and indirect damages to be proven at Trial.

WHEREFORE, Plaintiffs respectfully requests that Judgment be entered in their favor and against Origin on Count VI:  (a) awarding Plaintiffs compensatory damages in excess of Ten Million Dollars ($10,000,00) with the remainder to be proven at Trial;  (b) for prejudgment interest on the foregoing compensatory damages; and, (c) for such additional relief as the court deems just and proper in the premises.

## COUNT VII – FRAUDULENT MISREPRESENTATION

103.   Plaintiffs hereby allege and adopt fully each and every preceding paragraph as set forth herein and further alleges as follows:

104.   Plaintiffs and Origin entered into a contract for the purpose of obtaining Origin software and support services Origin represented to have certain characteristics.  During the time that Plaintiffs were engaged with Origin under both Agreements (I and II), Origin made material misrepresentations to Plaintiffs regarding the functional capacity of the Origin software.  For example, Origin represented to Plaintiffs that the Origin software would fluidly interface with Plaintiff's existing software/hardware.  In addition, Origin advertised one product yet sold the Plaintiffs another.  In addition, when Plaintiffs called Origin personnel to discuss issues that it was having regarding claims reimbursement, Origin represented that claims were properly presented to various payors when in fact they were not throughout the course of the agreement until the first quarter of 2012.  Origin, also failed to disclose that it was never positioned to resolve Plaintiff's technical issues as they arose.  Origin, represented to Plaintiffs that Origin's

software was positioned to adequately handle the requirements for Plaintiffs to receive Medicare/Medicaid reimbursements when this was untrue.

105. The representations mentioned above were false when Origin made then in that Origin software and services Plaintiffs ultimately received were materially dissimilar from the software Origin advertised to Plaintiffs. In addition, the software and support services under both Agreements (I and II) completely failed to interface successfully with Plaintiff's existing software and hardware, and more importantly, upon information and belief fails to meet EHR requirements, and has failed to allow plaintiffs to obtain reimbursements for claims submitted to payors. Following Agreement II, Origin represented Plaintiffs should have qualified for the Medicare/Medicaid Incentive Program payments and initially failed to do so due to Origin's faulty software and support services.

106. Origin made the representations mentioned above with the intent and for the purpose of deceiving Plaintiffs and to induce Plaintiffs to rely on the representations for Origin's own pecuniary benefit.

107. Plaintiffs were not only induced to enter into the Agreements (I and II), they continued the relationship with Origin and performed their duties in good faith based on their reasonable reliance on the representations mentioned above.

108. As a direct and proximate result of the aforementioned actions and representations, Plaintiffs suffered substantial pecuniary loss, to include economic and non-economic damages.

WHEREFORE, Plaintiffs respectfully requests that Judgment be entered in its favor and against Origin on Count VII: (a) awarding Plaintiffs compensatory damages in excess of Ten Million Dollars ($10,000,000) with the remainder to be proven at Trial; (b) consequential and indirect damages with the remainder to be proven at Trial; (c) for prejudgment interest on the

foregoing compensatory and consequential and indirect damages; (d) punitive damages to punish and deter others from similar conduct; and, (e) for such additional relief as the Court deems just and proper in the premises.

## COUNT VIII – NEGLIGENT MISREPRESENTATION

109.   Plaintiffs hereby allege and adopt fully each and every preceding paragraph as set forth herein and further alleges as follows:

110.   Plaintiffs and Origin entered into a contract for the purpose of obtaining Origin software and support services Origin represented to have certain characteristics.  During the time that Plaintiffs were engaged with Origin under both Agreements (I and II), Origin made negligent material misrepresentations to Plaintiffs regarding the functional capacity of the Origin software.  For example, Origin represented to Plaintiffs that the Origin software would fluidly interface with Plaintiff's existing software/hardware.  In addition, Origin advertised one product yet sold the Plaintiffs another.  In addition, when Plaintiffs called Origin personnel to discuss issues that it was having regarding claims reimbursement, Origin represented that claims were properly presented to various payors when in fact they were not and this occurred throughout the period of both agreements up until the first quarter of 2012.  Origin, also failed to disclose that it was never positioned to resolve Plaintiff's technical issues as they arose.  Origin, represented to Plaintiffs that Origin's software was positioned to adequately handle the requirements for Plaintiffs to receive Medicare/Medicaid reimbursements when this was untrue.

111.   The representations mentioned above were false when Origin made them in that Origin software and services Plaintiffs ultimately received were materially dissimilar from the software Origin advertised to Plaintiffs.  In addition, the software and support services under both Agreements (I and II) completely failed to interface successfully with Plaintiff's existing

software and hardware, and more importantly, upon information and belief fails to meet EHR requirements, and has failed to allow plaintiffs to obtain reimbursements for claims submitted to payors. Following Agreement II, Origin represented Plaintiffs should have qualified for the Medicare/Medicaid Incentive Program payments and initially failed to do so due to Origin's faulty software and support services.

112.  Origin made the representations mentioned above with carelessness and with no reasonable basis that it is true in order to induce Plaintiffs to rely on the representations for Origin's own pecuniary benefit.

113.  Plaintiffs were not only induced to enter into the Agreements (I and II), they continued the relationships with Origin and performed their duties in good faith based on their reasonable reliance on the representations mentioned above.  As a direct and proximate result of the aforementioned actions and representations, Plaintiffs suffered substantial pecuniary loss, to include economic and non-economic damages.

WHEREFORE, Plaintiffs respectfully requests that Judgment be entered in its favor and against Origin on Count VIII: (a) awarding Plaintiffs compensatory damages in excess of Ten Million Dollars ($10,000,000) with the remainder to be proven at Trial; (b) consequential and indirect damages to be proven at Trial; (c) for prejudgment interest on the foregoing compensatory and consequential and indirect damages; and, (d) for such additional relief as the Court deems just and proper in the premises.

### COUNT IX – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

114.  Plaintiff, Dr. Alexander, hereby alleges and adopts fully each and every preceding paragraph as set forth herein and further alleges as follows:

115.   The acts of of Origin mentioned herein were done willfully, maliciously, outrageously, deliberately, and purposely with the intention to inflict emotional distress upon Plaintiff.  Such acts were done in reckless disregard of the probability of causing Dr. Alexander emotional distress and said acts did in fact result in severe and extreme emotional distress.

116.   During the course of Dr. Alexander's relationship with Origin, Dr. Alexander and his staff placed several phone calls to Origin seeking technical support, inter alia, for the failed software.  Based on the responses by Origin, Plaintiffs were deprived of Medicare incentive payments or adequate reimbursements for the claims upon which they attempted to submit to various payors.  In addition, when confronted with direct evidence that Origin had deprived Plaintiffs of such reimbursements, Origin senior management merely responded "that's unfortunate."  Origin made no further attempt to resolve Dr. Alexander's issues.  As such, Dr. Alexander has been negatively affected both economically and non-economically including physical and emotional suffering.  Moreover, Dr. Alexander has been forced to allocated resources including time and money to his economic and non-economic detriment.

117.   As a direct and proximate result of Origin's alleged acts, Dr. Alexander incurred severe and grievous mental and emotional suffering and continues to suffer from such.

WHEREFORE, Plaintiffs respectfully requests that Judgment be entered in its favor and against Origin on Count IX:  (a) awarding Dr. Alexander an amount to be proven at Trial; (b) for prejudgment interest on the foregoing compensatory; (c) punitive damages to punish and deter others from similar conduct; and, (d) for such additional relief as the Court deems just and proper in the premises.

## COUNT X – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

118.  Plaintiff Dr. Alexander, hereby alleges and adopts fully each and every preceding paragraph as set forth herein and further alleges as follows:

119.  The acts of Origin mentioned herein were those which Origin knew or should have known that their actions would cause Dr. Alexander emotional distress and said acts did in fact result in severe and extreme emotional distress.

120.  During the course of Dr. Alexander's relationship with Origin, Dr. Alexander and his staff placed several phone calls to Origin seeking technical support, inter alia, for the failed software.  Based on the responses by Origin, Plaintiffs were deprived of Medicare incentive payments or adequate reimbursements for the claims upon which they attempted to submit to various payors.  In addition, when confronted with direct evidence that Origin had deprived Plaintiffs of such reimbursements, Origin senior management responded "that's unfortunate" while making no further attempt to resolve Dr. Alexander's issues.

121.  As a direct and proximate result of Origin's alleged acts, Dr. Alexander incurred severe and grievous mental and emotional suffering and continues to suffer from such.

WHEREFORE, Plaintiffs respectfully requests that judgment be entered in its favor and against Origin on Count X:  (a) awarding Plaintiffs' an amount to be proven at trial; (b) for prejudgment interest on the foregoing compensatory and consequential and indirect damages; and, (c) for such additional relief as the Court deems just and proper under the circumstances.

## COUNT XI – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

122.  Plaintiffs hereby allege and adopt fully each and every preceding paragraph as set forth herein and further alleges as follows:

123.   The acts of Origin as described herein were intentional and willful acts, were calculated to cause damage to Plaintiffs in its lawful business, were done with the unlawful purpose of causing damage and loss to Plaintiffs, and were done without right or justifiable cause on the part of Origin.

124.   As described herein, Origin intentionally and willfully committed tortuous acts calculated to cause damage to Plaintiffs in its lawful business of providing out medical services under both Agreements (I and II), by promoting and continuing to represent software and support services materially dissimilar to what Origin sold; and failing to provide adequate technical support; and making false representations to Plaintiffs' staff regarding Origin's software capabilities and support service capabilities.

125.   As a direct and proximate result of the aforementioned actions and representations, Plaintiffs suffered substantial pecuniary loss, to include economic and non-economic damages.

WHEREFORE, Plaintiffs respectfully request that Judgment be entered in its favor and against Origin on Count XI:  (a) awarding Plaintiffs' an amount to be proven at Trial; (b) for prejudgment interest on the foregoing compensatory and consequential and indirect damages; (c) punitive damages to punish and deter others from similar conduct; and, (d) for such additional relief as the Court deems just and proper in the premises.

## COUNT XII – NEGLIGENCE

126.   Plaintiffs hereby allege and adopt fully each and every preceding paragraph as set forth herein and further alleges as follows:

127.   Origin owed a duty to Plaintiffs, in performing the implementation of the software and services pursuant to both Agreements, to exercise the ordinary degree of care expected of electronic healthcare vendors who provide such to healthcare providers.

128.   Origin breached that duty of care to Plaintiffs by recommending that Plaintiffs invest in the software and services pursuant to both agreements; representing that the Origin software and services would serve Plaintiffs' needs during the time frame covering both Agreements; failing to advise that Origin did not possess the requisite implementation experience or support experience to provide Plaintiffs the version of the Origin software and services purchased by Plaintiffs under both Agreements.  Providing a misleading impression of the level of experience and qualifications of Origin to lead the implementation and support of the Origin software and services under both Agreements.   Failing to provide adequate project maintenance and guidance; failing to effectively troubleshoot problems or escalate critical issues when they were encountered; failing to properly test the Origin software and services through each phase of implementation and/or following implementation; and failing to properly train users of the Origin software and support services.

129.   As a direct and proximate result of Origin's negligence, Plaintiffs suffered damages in an excess of Ten Million Dollars ($10,000,000) in connection with the failure of Origin software and services, as well as other consequential and indirect damages to be proven at Trial.

WHEREFORE, Plaintiffs respectfully requests that Judgment be entered in their favor against Origin on Count XII:   awarding Plaintiffs compensatory and foreseeable damages in excess of Ten Million Dollars ($10,000,000) with the remainder to be proven at Trial; (b) for prejudgment interest on the foregoing compensatory damages; and, (c) for such additional relief as the Court deems just and proper in the premises.

## COUNT XIII – VIOLATION OF THE LANHAM ACT

130.   Plaintiffs hereby allege and adopt fully each and every proceeding as set forth herein and further allege as follows:

131.   In its commercial internet advertising and promotion of "Practice Manager" and "EMRge," Origin made false and misleading descriptions and representations of fact to Plaintiffs concerning the characteristics, specific application and design, and qualities of said products in violation of the Lanham Act U.S.C. § 1125(a).  For example, according to the website, "EMRge, covers virtually all practice management and clinical tasks including: Registration, Billing, Appointment scheduling, Collections, etc."  According to the website, it is a certified electronic health record solution that enables the customer "to satisfy meaningful use requirements while streamlining processes and saving time and money."  Origin provides "a team of experts with specialty training who will work closely with you to make process and workflow recommendations resulting in increased efficiency and productivity;" "a significant reduction in overhead expense"; "technology solutions that electronically review payor contracted rates and flags underpayments, ensuring maximum timely reimbursement."  In addition, the website indicates "we [Origin] achieve long-term accounts receivable stability by submitting timely, clean claims.  We immediately identify tardy and underpaid claims and provide extensive follow up by our expert team as needed."

132.   The commercial misrepresentations made by Origin, had a direct impact on Plaintiffs' ability, or failure, to function and generate medical records and function as an efficient and competent interventional pain medicine health care provider, and caused Plaintiffs extreme difficulty in keeping its legal and mandatory medical record requirements of the State of Indiana and the American Medical Association.  Plaintiffs expended considerable expense and time based on the commercial misrepresentations made by Origin in its marketing material and instructions from its employees, and spent many hours working on the system to improve a

program they promised and advertised was specifically designed for interventional pain medicine specialist, which it is not.

133.  Furthermore, Origin made promises to Plaintiffs and its customers while relying on commercial misrepresentations.  Plaintiffs suffered a loss of business reputation, significant time attempting to work through the inherit problems in the software, and good will as a direct result of Origin's false and deceptive advertising.

134.  As a direct and proximate result of Origin's representations, conduct and actions, Plaintiffs suffered damages in an amount in excess of Ten Million Dollars ($10,000,000).

WHEREFORE, Plaintiffs respectfully requests that Judgment be entered in their favor and against Origin on Count XIII:  (a) awarding Plaintiffs compensatory damages in excess of Ten Million Dollars ($10,000,000) with the remainder to be proven at Trial; (b) for attorneys' fees as allowed by Lanham Act U.S.C. §1117; (c) for disgorging of Defendant's profits as allowed by Lanham Act U.S.C. §1117;   (d) for prejudgment interest on the foregoing compensatory damages; and, (e) for such additional relief as the court deems just and proper in the premises.

## V.  JURY DEMAND

Plaintiffs demand a Jury as to all issues and counts so triable.

Respectfully submitted,

ROBERTS & BISHOP

_Tasha Roberts_

Kenneth T. Roberts, Ind. Atty. No. 6099-49
Tasha R. Roberts, Ind. Atty. No. 22520-49
Adam Lenkowsky, Ind. Atty. No. 24277-49

Attorney for Plaintiffs Pain Center of SE Indiana, LLC, Indiana Pain Medicine and Rehabilitation Center, P.C.. and Anthony Alexander, M.D.

Kenneth T. Roberts
Tasha R. Roberts
Adam Lenkowsky
**ROBERTS & BISHOP**
118 North Delaware Street
Indianapolis, Indiana 46204
Telephone:  (317) 631-0172
Facsimile:  (317) 631-0178
E-mail:  KTRJustice@aol.com,
troberts@roberts-bishop.com,
alenkowsky@roberts-bishop.com

Volney Brand
**BRAND LAW PLLC**
3523 McKinney Avenue
Dallas, Texas  75204
Telephone:  (214) 932-1472
Facsimile:  (214) 932-1473
E-mail:  volney@brandlaw.us.com