| | | |
|---|---|---|
| PAIN CENTER OF SE INDIANA, LLC, | ) | |
| INDIANA PAIN MEDICINE AND | ) | |
| REHABILITATION CENTER, P.C., and | ) | |
| ANTHONY ALEXANDER, M.D. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:13-cv-00133-RLY-DKL |
| | ) | |
| ORIGIN HEALTHCARE SOLUTIONS | ) | |
| LLC, | ) | |
| SSIMED, LLC, and | ) | |
| ORIGIN HOLDINGS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON DEFENDANTS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

Plaintiffs, Pain Center of SE Indiana, LLC, The Pain Medicine and Rehabilitation

Center, P.C., and Anthony Alexander, M.D. (collectively referred to as "Plaintiffs"),

operated a privately-owned outpatient medical clinic in Seymour, Indiana. This case

arises out of certain medical practice software Plaintiffs purchased from Defendants,

Origin Healthcare Solutions LLC; SSIMED (d/b/a SSIMED Holding, LLC); and Origin

Holdings, Inc. (collectively, "Origin"). Plaintiffs allege Origin personnel fraudulently

induced Plaintiffs to purchase the software, and fraudulently misrepresented the quality,

character, and other pertinent facts regarding its support services and software.

Defendants now move to dismiss Counts I, II, V, VII, VIII, IX, XI, XII, and XIII of

Plaintiffs' First Amended Complaint under Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, the motion is **GRANTED** in part, and **DENIED** in part.

## I.    Background

According to the First Amended Complaint ("Amended Complaint"), SSIMED was established in 1991 as an electronic health record vendor and provider of physician software and services. (Am. Compl. ¶ 14.) The software was directed at medical claim coding, patient appointment tracking, and medical insurance billing. (*Id*.) Plaintiffs allege that, due to a SSIMED sales representative's misrepresentations, Plaintiffs entered into a contract to purchase the "SSIMED Practice Manager Suite: including Practice Manager and Scheduler" in June 2003. (*Id*. at ¶¶ 30-35.) Plaintiffs allege they were falsely assured that SSIMED had installed dozens of these systems without error, installing this new program was less expensive than maintaining their current software, the software and services would prevent any problems with claim reimbursements, the software would be adequately maintained, the users would be trained, and the representatives and relevant support staff had been extensively trained. (*Id*.) At some later point, Origin Healthcare Solutions assumed the contracts as successors-in-interest to SSIMED. (*Id*. at ¶ 17.)

Shortly after entering into the agreement, the software began exhibiting errors, which Plaintiffs claim they were unaware of at the time. (*Id*. at ¶ 38.) However, Plaintiffs began noticing they had not received anticipated revenues from third party payors, including Medicaid, Medicare, and various insurance companies, despite having

presented claims through the new software.  (*Id*. at ¶ 39.)  Origin's staff indicated that the problems were due to the insurance companies' decisions to decline the submitted bills. (*Id*. at ¶ 40.)  Plaintiffs allege the claims were never actually presented to the insurance companies, which was hard for them to discover because of the difficulty of separating single claim errors from the submissions of millions of bundled claims that were transferred at once in batch files.  (*Id*.)  Plaintiffs claim these problems were exacerbated by Origin's inadequate training of users and employees.  (*Id*. at ¶ 43.)

Around November 2006, an Origin sales representative told Plaintiffs its product "EMRge" would allow for expedient billing reimbursement and patient record management that would upgrade Plaintiffs' current system. (*Id*. at ¶ 46.)  Plaintiffs allege Origin stated "EMRge" was specifically designed to work with "Practice Manager" and would eliminate past inconveniences that occurred because it was using different clinical data software. (*Id*.)  Origin further stated this package did not have "glitches" that would result in bills not being properly submitted to the insurance companies.  (*Id*. at ¶ 47.) Origin assured Plaintiffs that even if such problems were to occur, the software had the capacity to prevent and/or rectify such problems and the adequately trained support staff would prevent losses from occurring. (*Id*.)

In addition, Plaintiffs allege they learned through an Origin employee that Origin had possession of Plaintiffs' submission histories, and failed to inform Plaintiffs of the fact that over a 10-year period, Plaintiffs' report generated only $21.9 million despite clinical visit numbers which justified well in excess of $30-36 million. (*Id*. at ¶ 60.)  As a

result of the severe shortfall in claims reimbursements, Plaintiffs were forced to borrow from banks and friends to cover financial obligations. (*Id.* at ¶ 70.)

Plaintiffs' 48-page Amended Complaint against Origin consists of thirteen Counts, including counts for fraud (Count I), fraud in the inducement (Count II), unjust enrichment (Count V), fraudulent misrepresentation (Count VII), negligent misrepresentation (Count VIII), intentional infliction of emotional distress (Count IX), tortious interference with a business relationship (Count XI), negligence (Count XII), and a Lanham Act claim (Count XIII).

All other allegations necessary to the court's decision will be addressed in the Discussion Section.

## II. Dismissal Standard

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is evaluated under the same standard of review as a 12(b)(6) motion. *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007). To survive a motion to dismiss, "the complaint need only contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *EEOC v. Concentra Health Servs.,* 496 F.3d 773, 776 (7th Cir. 2007) (quoting Rule 8(a)(2)). In ruling on a motion to dismiss, the court construes the allegations of the complaint in the light most favorable to the plaintiff, and all well-pleaded, nonconclusory, factual allegations in the complaint are accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A motion to dismiss should be granted if the plaintiff fails to proffer "enough facts to state a claim that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). A claim has facial plausibility "when

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

Asking for plausible grounds does not impose a probability requirement at the pleading stage; instead, it requires the plaintiff to plead enough facts to raise a reasonable expectation that discovery will reveal evidence of the allegation. *Twombly*, 550 U.S. at 545. The need at the pleading stage for plausible allegations reflects Rule 8(a)(2)'s threshold requirement that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." *Id.*

## III. Discussion

As noted previously, Defendants move to dismiss eight state law tort claims asserted in Counts I, II, V, VII, VIII, IX, XI, and XII, and one federal claim asserted in Count XIII. Indiana law governs Plaintiffs' state law claims. The court will begin its discussion with Plaintiffs' fraud claim.

### A. Count I, Fraud

#### 1. Actual Fraud

To establish actual fraud under Indiana law, a plaintiff must show there is: (1) a material misrepresentation of past or existing fact (2) made with knowledge of or reckless disregard for the falsity of the statement, and (3) the misrepresentation is relied upon to the detriment of the relying party. *Schott v. Huntington Nat. Bank,* No. 1:12-cv-430, 2012 WL 6725902, at *7 (S.D. Ind. Dec. 27, 2012) (citing *Colonial Penn Ins. Co. v. Guzorek,* 690 N.E.2d 664, 675 (Ind. 1997)). When a plaintiff alleges fraud, she must "state with particularity the circumstances constituting fraud . . . Malice, intent,

knowledge, and other conditions of a person's mind may be alleged generally." Fed. R.

Civ. P. 9(b). The Rule requires a plaintiff to allege a "general outline" of the alleged

fraud that would "reasonably notify the defendants of their purported role in the scheme."

*Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992).

A plaintiff asserting fraud must perform a "pre-complaint investigation to assure

that the claim is responsible and supported, rather than defamatory and extortionate."

*Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).

Consequently, the complaint must demonstrate the "who, what, when, where, and how"

of the fraud. *Id.* Specifically, the complaint must state "the identity of the person who

made the representation, the time, place, and content of the misrepresentation, and the

method by which the misrepresentation was communicated to the plaintiff." *Windy City*

*Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.,* 563 F.3d 663, 668 (7th

Cir. 2008). The requirements will be somewhat tempered, however, when a plaintiff

"does not have access to all the facts necessary to provide details, such as when those

facts are within the exclusive knowledge of the defendant." *Hirata Corp. v. J.B. Oxford*

*and Co.,* 193 F.R.D. 589, 592 (S.D. Ind. 2000).

Here, Plaintiffs assert the following allegations to support their claim of fraud: (1)

Origin representatives intentionally and materially made misleading representations

regarding the characteristics and services associated with Origin software prior to signing

contracts in 2003 and 2006; (2) Origin knew the representations were false when it made

them, or it made them with reckless disregard for their truth or falsity; and (3) Plaintiffs

relied on Origin's representations to their detriment, suffering substantial pecuniary loss

including economic and non-economic damages and additional damages. (Am. Compl. ¶¶ 73-79.)  Origin argues that this is not enough, as Plaintiffs failed to satisfy the "who, when, where, and how" required by Rule 9(b) to maintain a cause of action for fraud. The court disagrees.

Plaintiffs generally identify the "who" as Origin representatives.  Identification of the individual employee is not necessary at this time because "institutional identifications meet the Rule 9(b) standard." *MDG Int'l, Inc. v. Australian Gold, Inc.,* No. 1:07-cv-1096, 2008 WL 3982072, at *3 (S.D. Ind. Aug. 22, 2008) (citing *Blaz v. Michael Reese Hosp. Found.,* 191 F.R.D. 570, 574 (N.D. Ill. 1999) (finding the institutional identity of the caller is what matters, not the individual employee, so plaintiff sufficiently pled the "who" requirement of Rule 9(b))).  Further, "Exhibit A" identifies Joy King/Long as the sales representative.  *See* Fed. R. Civ. P. 20(c) (written instrument that is an exhibit to the pleading is part of pleading for all purposes).  Thus, the "who" requirement is satisfied.

Plaintiffs also allege when Origin's misrepresentations were made, i.e., during the periods of June 2003 and November 2006 (Am. Compl. ¶¶ 29-35; 46-51).  Therefore, the Defendants have been provided sufficient notice as to when the misrepresentations occurred.  *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (allegations that misrepresentation occurred "sometime in late August or early September 2003" satisfied Rule9(b)); *Comentis, Inc. v. Purdue Research Found.,* 765 F. Supp. 2d 1092, 1110 (N.D. Ind. 2011) ("in or about February 2009" provided sufficient detail under Rule 9(b)); *Greer v. Advanced Equities, Inc.,* 683 F. Supp. 2d 761, 772 (N.D. Ill. 2010) ("the 'fall of 1999' or 'November 1999' is specific enough under Rule 9(b)").  Again, the exhibits

provide further specificity as to the dates of those representations. As such, the Plaintiffs also met the "when" requirement.

Lastly, Plaintiffs allege the "how" and "where" the alleged misrepresentations were made. Specifically, the "how" was Origin making affirmative misrepresentations, and the "where" was the business presentation at Plaintiffs' principal place of business. (Am. Compl. ¶¶ 30-31; 464-7.); *Methodist Hosps., Inc. v. FTI Cambio*, No. 2:11-cv-36 *2 (N.D. Ind. Dec. 5, 2011) (finding the plaintiff alleging a "sales presentation in July 2007" was sufficient for the "where" requirement of fraud, and "making affirmative representations" was sufficient for the "how" for the purposes of Rule 9(b)). Thus, the final elements of fraud are met. As a result, Defendant's motion for partial judgment on the pleadings for actual fraud is **DENIED**.

### b. Constructive Fraud

Count I can also be construed as alleging a claim for constructive fraud. To state a claim for constructive fraud, Indiana law requires plaintiff to prove: (1) a duty owing by the party to be charged to the complaining party due to their relationship; (2) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (3) reliance thereon by the complaining party; (4) injury to the complaining party as a proximate result thereof; and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party. *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996). Duty in constructive fraud only exists where there is a fiduciary relationship. *Mullen v. Cogdell,* 643 N.E.2d 390, 401 (Ind. Ct. App. 1994).

Plaintiffs allege: (1) such a duty exists between the parties based upon a buyer-seller relationship; (2) only Origin was aware of what it made and how it was made; (3) Plaintiffs relied on the sales representative's professed knowledge of the truth of the statements, given they did not possess such knowledge; (4) Plaintiffs were harmed as a result; and (5) Origin received the benefit of payment for the software and support as a result. (Am. Compl. ¶¶ 29-35; 46-51.)

Origin argues that the first element is not met due to the absence of a confidential relationship. However, under Indiana law, in the absence of a confidential relationship, constructive fraud may arise in the buyer-seller context where one party may possess knowledge not possessed by the other and may thereby enjoy a position of superiority over the other. *Mullen*, 643 N.E.2d at 401. Thus, constructive fraud exists where: (1) a seller makes unqualified statements in order to induce another to make a purchase; (2) the buyer relies upon the statements; and (3) the seller has professed to the buyer that he has knowledge of the truth of the statements. *Scott v. Bodor, Inc.*, 571 N.E.2d 313, 324 (Ind. Ct. App. 1991).

Plaintiffs allege (1) Origin made false representations about its software and services that it was unqualified to make; (2) Plaintiffs relied on Origin's statements because they did not possess such knowledge; and (3) Origin professed knowledge of the truth of those statements. (Am. Compl. ¶¶ 29-35; 46-51). Further, Plaintiffs allege they were injured as a result of their reliance on Origin's statements. *Id.* Thus, Plaintiffs adequately pled the elements for constructive fraud. Accordingly, Origin's motion for partial judgment on the pleadings as to Plaintiffs' constructive fraud claim is **DENIED**.

### B. Count II, Fraud in the Inducement

"Fraudulent inducement occurs when a party is induced through fraudulent misrepresentations to enter into a contract." *Lightning Litho, Inc. v. Danka Indus., Inc.,* 776 N.E.2d 1238, 1241 (Ind. Ct. App. 2002). Unlike actual or constructive fraud, a plaintiff who prevails on a claim for fraud in the inducement must elect between two remedies: either rescind the contract, return any benefits received, and be returned to the status quo, or affirm the contract, retain the benefits, and seek damages. *Id.* The elements for fraud in the inducement, however, are the same elements as in actual fraud. *Tru-Cal, Inc. v. Conrad Kacsik Instrument Sys., Inc.,* 905 N.E.2d 40, 44-45 (Ind. Ct. App. 2009).

The allegations supportive of Plaintiffs' fraudulent inducement claim are remarkably similar to those set forth in Count I. Accordingly, the court finds Plaintiffs have also met the heightened pleading requirements for fraud in the inducement. (Am. Compl. ¶¶ 83-93.) Thus, Origin's motion for partial judgment on the pleadings on Plaintiffs' claim of fraud in the inducement is **DENIED**.

### C. Count V, Unjust Enrichment

Unjust enrichment is often referred to as quantum meruit, contract implied-in-law, constructive contract, or quasi-contract, and it requires a party "who has been unjustly enriched at another's expense to make restitution to the aggrieved party." *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind. 1991). To prevail on an unjust enrichment claim, a plaintiff must generally show: (1) he rendered a benefit to the defendant at the defendant's express or implied request, (2) the plaintiff expected payment from the

defendant, and (3) allowing the defendant to retain the benefit without restitution would be unjust. *Reed v. Reid*, 980 N.E.2d 277, 296 (Ind. 2012) (citing *Bayh,* 573 N.E.2d at 408)).

When there is an express contract, recovery cannot be based on a theory implied in law, such as unjust enrichment, for two reasons: "(1) a contract provides a remedy at law; and (2) as a remnant of chancery procedure, a plaintiff may not pursue an equitable remedy when there is a remedy at law." *Coppolillo v. Cort*, 947 N.E.2d 994, 997 (Ind. Ct. App. 2011). Recently, the Indiana Court of Appeals noted an exception to that rule – "when an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice." *Id. See also Kohl's Indiana L.P. v. Owens*, 979 N.E.2d 159, 168 (Ind. Ct. App. 2012) (same).

Here, Plaintiffs allege:

113. Plaintiffs' payments to Origin were a specific benefit conferred upon Origin.

114. The acceptance and retention by Origin of the benefit conferred on it were under such circumstances that it would be inequitable for Origin to retain the benefit, because Origin was unjustly enriched by Plaintiffs' payments in connection with Origin's software and services.

115. As a direct and proximate result of Origin's conduct, Plaintiff's [sic] seeks reimbursement in an amount to be proven at Trial.

(Am. Compl. ¶¶ 111-114.)

The parties' express agreements fully address the subject of Plaintiffs' payment obligations and Origin's software and support service obligations. Plaintiffs' argument that they allege conduct that is beyond the contract – "several examples of fraudulent

conduct on the part of Defendants who retained Plaintiffs' payments despite its conduct and the injustice of such retention"— is misplaced. That conduct actually falls within the scope of the parties' agreements, as Origin only received payments from Plaintiffs as provided in their agreements. Moreover, Plaintiffs have pursued relief for Origin's alleged fraud through their other tort claims. Therefore, Origin's motion for partial judgment on the pleadings on Plaintiff's claim of unjust enrichment is **GRANTED**.

### D. Count VII, Fraudulent Misrepresentation

A claim for fraudulent misrepresentation, just as a claim for fraud in the inducement, has the same elements as actual fraud. Even though Plaintiffs' claim is entitled Fraudulent Misrepresentation, which also happens to be one of the essential elements of a claim for fraud, the court finds Plaintiffs adequately set forth factual allegations sufficient to state a claim for fraud[1]. Thus, Origin's motion for partial judgment on the pleadings is **DENIED.**

### E. Count VIII, Negligent Misrepresentation

A claim for negligent misrepresentation requires a plaintiff to establish that:

(1) The defendant, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions;

(2) the defendant fails to exercise reasonable care or competence in obtaining or communicating the information;

---

[1] As a side note, Origin maintains that Plaintiffs' fraud claims asserted in Counts I, II, and VII are duplicative and should therefore be dismissed. The court has found Plaintiffs adequately state claims for relief. Thus, a motion to dismiss is improper. The appropriate motion in such a circumstance is a motion to strike under Rule 12(f).

(3) the plaintiff justifiably relies upon the information supplied by the defendant; and

(4) the plaintiff suffers pecuniary loss as a result.

*Harrison Mfg., LLC v. Bienias*, No. 4:11-cv-65, 2013 WL 6486668, at *6 (S.D. Ind. Dec. 10, 2013).

Plaintiffs allege that "[d]uring the time the Plaintiffs were engaged with Origin under both Agreements," Origin made negligent material misrepresentations to Plaintiffs regarding the Origin software that it was selling to Plaintiffs, including, but not limited to, the software's functional capacity, and its ability to adequately receive Medicare/Medicaid reimbursements. (Am. Compl. ¶ 129.) Plaintiffs further allege that Origin "also failed to disclose that it was never positioned to resolve Plaintiffs' technical issues as they arose." (*Id*.) These misrepresentations were made "with carelessness and with no reasonable basis that it [sic] is true in order to induce Plaintiffs to rely on the representations for Origin's own pecuniary benefit." (Am. Compl. ¶¶ 129-131.) Plaintiffs allege they were thus induced to enter into the agreements, and they continued their business relationship with Origin based on their reasonable reliance on Origin's representations. (*Id*. at ¶ 132.) Consequently, Plaintiffs suffered substantial pecuniary loss, including economic and non-economic damages. (*Id*.)

"[T]he condition of Indiana law regarding the tort of negligent misrepresentation has been aptly described as 'relative chaos.'" *Thomas v. Lewis Eng'g, Inc*. 848 N.E.2d 758, 760 (Ind. Ct. App. 2006) (citations omitted). The tort was originally limited to the employer-employee relationship, *Eby v. York-Division, Borg-Warner*, 455 N.E.2d 623

(Ind. Ct. App. 1983), but has since been expanded to include those whose profession includes the giving of opinions. *U.S. Bank, N.A. v. Integrity Land Title Corp.*, 929 N.E.2d 742, 747 (Ind. Ct. App. 2010). The class of professionals who could be subject to a negligent misrepresentation claim includes, but is not limited to, "brokers, attorneys, abstractors, and surveyors." *Jeffrey v. Methodist Hosps.*, 956 N.E.2d 151, 156 n. 7 (Ind. Ct. App. 2011) (declining to limit the class of professionals to brokers, attorneys, abstractors, and surveyors); *see also Eby*, 455 N.E.2d at 629 (defining professionals as "one whose primary function is to render actionable professional opinions").

The court finds Plaintiffs have not alleged a claim for negligent misrepresentation for two reasons. First, Origin staff members were not "professionals," because their representations regarding the qualities and functions of the software were not the type of professional opinions that are actionable. Instead, its relationship with Plaintiffs was one of salesperson-customer and support staff-customer. Indeed, Plaintiffs allege misrepresentations of fact, not of opinion. Accordingly, Origin's motion for partial judgment on the pleadings on Plaintiff's claim of negligent misrepresentation is **GRANTED**.

### F. Count IX, Intentional Infliction of Emotional Distress

To establish a claim of intentional infliction of emotional distress, a plaintiff must allege that Origin: (1) engaged in extreme and outrageous conduct (2) which intentionally or recklessly (3) caused (4) severe emotional distress to another." *Curry v. Whitaker*, 943 N.E.2d 354, 361 (Ind. Ct. App. 2011). It is the intent to harm the plaintiff emotionally

that constitutes the basis of the tort, and the requirement to prove the elements of the tort are rigorous. *Id.* This claim is brought only by Dr. Alexander.

Dr. Alexander alleges he was deprived of Medicaid incentive payments and claims reimbursements due to Origin's software and inept support staff, and that when Dr. Alexander and his staff confronted Origin "with direct evidence that Origin had deprived Plaintiffs of such reimbursements, Origin senior management merely responded 'that's unfortunate.'" (Am. Compl. ¶ 135.) Origin made no attempt to resolve Dr. Alexander's issues, and it committed falsehoods regarding submission histories and the client center, "despite possessing an admitted awareness that Plaintiffs had millions of dollars in 'unclean claims' in a que Origin had instant access to." Plaintiffs also allege the "acts of Origin were done willfully, maliciously, outrageously, deliberately, and purposely with the intention to inflict emotional distress" and as a direct and proximate result of Origin's acts, "Dr. Alexander incurred severe and grievous mental and emotional suffering and continues to suffer from such, including severe depression." (*Id.* at ¶¶ 134-136.)

Origin argues that Dr. Alexander failed to allege extreme and outrageous conduct as required to maintain a claim of intentional infliction of emotional distress. The requirements to prove the elements of this tort are rigorous. The conduct giving rise to a claim of intentional infliction of emotional distress must exceed all bounds usually tolerated by a decent society and cause mental distress of a very serious kind. *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991); *AutoXchange.com, Inc., v. Dreyer & Reinbold, Inc.*, 916 N.E.2d 40, 52 (Ind. Ct. App. 2004) (noting that an intentional infliction of emotional distress claim will be sustained only if the conduct is "so outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."). A party must allege conduct that would cause "an average member of the community" to cry "Outrageous!" upon hearing the conduct. *Gable v. Curtis*, 673 N.E.2d 805-7, 810 (Ind. Ct. App. 2001); *Conwell v. Beatty*, 667 N.E.2d 768, 777 (Ind. Ct. App. 1996).

At this stage, Dr. Alexander need not prove his claim, but merely must state a plausible claim for relief. Although this is a close call, the court finds Dr. Alexander has successfully done so. The Amended Complaint states that, as a result of Origin's willful, deliberate, and purposeful actions, Dr. Alexander suffers emotionally and is severely depressed. This is understandable given the monetary loss alleged – $25,000,000. Origin's motion for partial judgment on the pleadings on Plaintiffs' intentional infliction of emotional distress claim is **DENIED**.

### G. Count XI, Tortious Interference with Business Relations

To establish a claim for tortious interference with business relations, a plaintiff must show: (1) the existence of a valid business relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from the defendant's wrongful interference with the relationship. *Columbus Med. Servs. Org., LLC v. Liberty Healthcare Corp.,* 911 N.E.2d 85, 94 (Ind. Ct. App. 2009). Additionally, the Indiana Supreme Court has affirmed that "this tort requires some independent illegal action." *Barzauskas v. Fort Wayne-South Bend Diocese*, *Inc.*, 796 N.E.2d 286, 291 (Ind. 2003).

Plaintiffs allege "[t]he acts of Origin as described herein were intentional and willful acts, were calculated to cause damage to Plaintiffs in [their] lawful business, were done with the unlawful purpose of causing damage and loss to Plaintiffs, and were done without right or justifiable cause on the part of Origin."  (Am. Compl. ¶ 138.)

Origin contends that the Plaintiffs did not plead the "illegality" requirement of this claim.  However, Plaintiffs respond that their allegations of tortious acts, including fraud, meet the requisite unlawfulness element in dispute.  As in *Reginald Martin Agency v. Conseco Med. Ins. Co.,* this court agrees that Plaintiffs' allegations of fraud, if proved, could satisfy the illegal conduct element.  388 F. Supp. 2d 919, 931-2 (S.D. Ind. 2005).

Therefore, Origin's motion for partial judgment on tortious interference with business relations is **DENIED**.

### H. Count XII, Negligence

In Indiana, the elements of a negligence claim are: (1) a duty owed to plaintiff by defendant, (2) breach of duty by allowing conduct to fall below the applicable standard of care, and (3) a compensable injury proximately caused by defendant's breach of duty. *Pisciotta v. Old Nat'l Bancorp,* 499 F.3d 629, 635 (7th Cir. 2007).

Plaintiffs allege Origin owed a duty to Plaintiffs in performing the implementation of the software and services pursuant to both agreements, to exercise the ordinary degree of care expected of electronic healthcare vendors who provide such to healthcare providers. (Am. Compl. ¶ 143.)   Plaintiffs also allege Origin breached that duty by, amongst other actions, recommending Plaintiffs invest in Origin's software and services; representing the software and services would serve Plaintiffs' needs; and failing to advise

that Origin did not possess the requisite experience to provide Plaintiffs the version of the software and services purchased by Plaintiffs under both agreements. (*Id*. at ¶ 144.) As a direct and proximate result of Origin's negligence, Plaintiffs suffered damages in excess of $25,000,000. (*Id*. at ¶ 145.)

Origin argues that Plaintiffs' tort claim for negligence is precluded by the economic loss rule. Under the economic loss rule, "contract is the sole remedy for the failure of a product or service to perform as expected." *Gunkel v. Renovations, Inc.,* 822 N.E.2d 150, 152 (Ind. 2005). The rule "reflects that the resolution of liability for purely economic loss caused by negligence is more appropriately determined by commercial rather than tort law." *Indianapolis-Marion County Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 729 (Ind. 2010). Economic loss occurs when there is "no personal injury and no physical harm to other property," and is defined by Indiana courts as "the diminution in the value of a product and consequent loss of profits because the product is inferior in quality and does not work for the general purposes for which it was manufactured and sold. Economic loss includes such incidental and consequential losses as lost profits, rental expense, and lost time." *Gunkel*, 822 N.E.2d at 153-4.

Plaintiffs' negligence claim sounds in contract, not in tort. The alleged breach of duty relates to whether the products and services that were the subject of the parties' contracts performed as expected. Plaintiffs seek monetary damages and lost profits, not personal injury or property damages. Origin's motion for partial judgment on the pleadings is **GRANTED**.

### I. Count XIII, Violation of Lanham Act

In Count XIII, Plaintiffs bring a claim for violation of § 1125(a), the Lanham Trademark Act of 1946 ("Lanham Act"). The purpose of this Act is to protect persons engaged in commerce against unfair competition. 15 U.S.C. § 1051 et seq.; 124 A.L.R. Fed 189. The Lanham Act creates civil liability for deceptive advertising, as Section 1125(a) provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

U.S.C. § 1125(a)(1)(B).

Origin argues that Plaintiffs lack standing to bring a claim for a violation of 15 U.S.C. § 1125(a) because Plaintiffs are not competitors of Origin and therefore, are outside the "zone of interests" protected by the Lanham Act. The zone of interests test is a new development in Lanham Act standing analysis. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1388-89 (2014) ("The zone-of-interests test is therefore an appropriate tool for determining who may invoke the cause of action in § 1125(a)."). To understand the Supreme Court's holding, the facts of the case are helpful.

The parties involved in *Lexmark* were both engaged in the toner cartridge industry. Lexmark manufactured its own toner cartridges for use in its laser printers; Static Control manufactured toner and component parts necessary in the remanufacture of Lexmark cartridges. *Id.* at 1383-84. In an effort to curb the secondary market for its toner cartridges, Lexmark introduced a "Prebate" program, which enabled customers to purchase new toner cartridges at a 20% discount if they would agree to return the cartridge to Lexmark once it was empty. *Id.* at 1383. To enforce the terms of the Prebate, Lexmark installed a microchip to disable the cartridge after it ran out of toner. *Id.* at 1383. Thus, for the consumer to use the cartridge again, the consumer had to go to Lexmark to have the microchip replaced. *Id.* Static Control then developed a microchip that could mimic the microchip in Lexmark's cartridges, thus enabling remanufacturers to refurbish and resell Lexmark Prebate cartridges. *Id.* at 1384. A lawsuit ensued, the issue turning on whether Static Control had standing to sue Lexmark for false advertising under the Lanham Act. The Supreme Court granted certiorari due to a circuit split on the appropriate standing analysis.

Relevant for purposes of this case is the fact that, although Lexmark and Static Control were not direct competitors, they were competitors nonetheless. In other words, Static Control was within the zone of interests the Lanham Act was meant to protect. "A consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III, but he cannot invoke the protection of the Lanham Act." *Id.* at 1390. "Even a business misled by a supplier into purchasing an inferior product is, like consumers generally, not under the Act's aegis." *Id.*

Here, Plaintiffs are not within the zone of interests of the Lanham Act. Instead, they are consumers who allege injury due to Origin's software and support services. Accordingly, Plaintiffs lack standing to bring Count XIII. Origin's motion for judgment on the pleadings on Plaintiffs' § 1125(a) Lanham Act claim is **GRANTED**.

## IV.  Conclusion

For the reasons set forth above, the court **GRANTS** in part and **DENIES** in part, Origin's Motion for Partial Judgment Pursuant to Rule 12(c) (Filing No. 72). Specifically, Defendant's Motion is **GRANTED** with respect to Counts V, VIII, XII, and XIII, and **DENIED** with respect to Counts I, II, VII, and XI.


**SO ORDERED** this 1st day of December 2014.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.