UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PAIN CENTER OF SE INDIANA, LLC; INDIANA PAIN MEDICINE AND REHABILITATION CENTER, P.C.; and ANTHONY ALEXANDER, M.D., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | 1:13-cv-00133-RLY-DKL |
| vs. | ) ) | |
| ORIGIN HEALTHCARE SOLUTIONS LLC; SSIMED (d/b/a SSIMED Holding, LLC); ORIGIN HOLDINGS, INC., a Delaware Corporation; JOHN DOES (1–50) inclusive; and JOHN DOES (1–100) inclusive, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

This matter comes before the court on the parties' cross motions for summary

judgment. Plaintiffs, Pain Center of SE Indiana, LLC ("Pain Center"), the Indiana Pain

Medicine and Rehabilitation Center, P.C. ("PMRC"), and Anthony Alexander, M.D.

("Dr. Alexander"), brought this action asserting twelve claims against Defendants,

SSIMED; Origin Healthcare Solutions, LLC; and Origin Holdings, Inc. (collectively,

"SSIMED"). Plaintiffs' claims arise out of two licensing contracts for practice

management and electronic medical records software from SSIMED. Plaintiffs seek

summary judgment on their breach of contract claim, their theory of joint and several

liability under the corporate alter ego doctrine, and Defendants' affirmative defenses of

1

waiver, statute of limitations, laches, and judicial estoppel. Origin moves for summary judgment on each of Plaintiffs' claims. For reasons set forth below, the court **GRANTS** summary judgment in favor of SSIMED and **DENIES** Plaintiffs' motion for partial summary judgment.[1]

## I.      Standard

On summary judgment, the court should "pierce the pleadings and . . . assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The moving party must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive the motion, the nonmoving party must present specific facts showing the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008) (internal quotation marks omitted). At the summary judgment stage, the evidence put before the court need not be admissible in form, but it must be admissible in content. *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016) (citing *Winskunas v. Birnbaum*,

---

[1]  Also before the court is Plaintiffs' motion to strike SSIMED's surreply to Plaintiffs' Motion for Partial Summary Judgment. Because the surreply challenges evidence Plaintiffs rely on in support of their motion for partial summary judgment, and because the court finds in favor of SSIMED on its motion for summary judgment, the court DENIES Plaintiffs' motion to strike as moot.

23 F.3d 1264, 1267–68 (7th Cir. 1994)); *see also Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("Admissibility is the threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment.").

## II.    Factual Background[2]

SSIMED provides full-service billing to health care providers using its proprietary software, Practice Manager.  (Filing Nos. 324-1, 338-15, 328-5, and 333-1 ("McMahon Dep.") at 26:18–24, 29:1–11).[3]  Full-service clients leave the billing and revenue collection aspects of their practices to SSIMED to manage.  (*Id.*).  SSIMED also licenses Practice Manager to "systems clients" who opt to manage their own billing and collection operations.  (*Id.* at 29:1–11; Filing No. 324-3 ("Defs.' Suppl. Answers to Pls.' Interrog.") at 7–8).  In addition to Practice Manager, SSIMED also licenses its medical records management software, known as EMRge, to practices that use electronic medical records.  (Filing Nos. 324-4, 338-5, 327-5, 333-4, and 346-1 ("Pls.' 30(b)(6) Dep.") at 82:3–6).

In 2005, a group of investors acquired SSIMED and other companies that provided technology products and services to medical providers.  (Filing Nos. 324-5, 338-13, 328-3, and 333-5 ("Kvam Dep.") at 21:8–17).  The investors formed Origin

---

[2]  Unless otherwise indicated, the following facts are undisputed.  The court will address any pertinent evidentiary issues below.

[3]  Both parties rely heavily on excerpts from common deposition testimonies in their respective motions, resulting in four designations for many deponents.  For the sake of clarity, the court will first cite to the parties' respective designations for each motion and then assign a shorthand notation for each deponent (e.g., "Pls.' 30(b)(6) Dep."), rather than distinguish between the parties' designations.  To the extent the parties cite to different portions of the same deposition transcript to generate a dispute of fact, the court will so note.

Healthcare Solutions, LLC to provide financial, marketing, and management support for the acquired companies. (*Id.* at 26:2–27:19, 31:2–20). Origin Holdings, Inc. indirectly owns Origin Healthcare Solutions LLC. (*See* Filing No. 25).

Dr. Alexander founded Pain Center in 2001 to provide clinical services to patients suffering from chronic pain. (Pls.' 30(b)(6) Dep. at 22:18–21). Pain Center reorganized itself as PMRC in 2008.[4] (*Id.* at 30:8–11). PMRC assumed all contracts executed by Pain Center, including the licensing agreements at issue in this matter. (*Id.* at 31:23–32:5).

### A.    SSIMED licenses Practice Manager and EMRge to Pain Center

In 2003, Joy Deckard, a representative of SSIMED, contacted Pain Center's billing specialist and office manager, Rhonda Mellencamp, about converting to Practice Manager as its billing software. (Filing Nos. 324-7, 338-17, 328-7, and 333-7 ("Mellencamp Dep.") at 70:9–25; Pls.' 30(b)(6) Dep. at 128:6–8). Pain Center and SSIMED executed a licensing agreement for Practice Manager on June 18, 2003. (Pls.' 30(b)(6) Dep. at 129:23–130:10). On June 28, 2006, the parties executed a separate licensing agreement for EMRge. (*Id.* at 143:21–144:13). Deckard represented SSIMED during the sale of each software package. (*Id.* at 144:1–7).

As a systems client of SSIMED, Pain Center used Practice Manager to generate its own claims for payment. (Filing No. 324-10, 338-18, 328-8, and 333-10 ("Harmon Dep.") at 144:19–145:11). The staff at Pain Center, including Mellencamp, received a

---

[4] The court will refer to Dr. Alexander and his entities as "Plaintiffs," and will distinguish between Pain Center and PMRC only where the distinction is pertinent.

week of on-site training on the software from SSIMED trainer, Amy Kiernan. (Filing

Nos. 324-9, 338-9, 327-9, and 333-9 ("Kiernan Dep.") at 87:1–7). Kiernan trained the

staff Monday through Thursday and then "shadowed" them on Friday as they used a

demo version of Practice Manager. (*Id.* at 87:1–7, 76:17–24). Kiernan also briefly

shadowed Dr. Alexander on Practice Manager, but testified that he did not attend the

majority of the training. (*Id.* at 88:2–10). Kiernan testified that she showed Dr.

Alexander how to use the software to schedule appointments, run billing reports, and how

to obtain product support from SSIMED. (*Id.* at 90:1–11). Kiernan returned to Pain

Center's office in 2006 to train its staff on the EMRge software. (*Id.* at 95:20–22,

129:12–15; Pls.' 30(b)(6) Dep. at 85:15–17).

### B.      Pain Center experiences problems with Practice Manager and EMRge

Although systems clients must use Practice Manager to generate their own claims,

SSIMED directs the claims to insurers and provides pertinent information regarding the

status of claims. (Filing Nos. 328-1 and 338-11 ("Burke Dep.") at 104:5–24; Filing Nos.

327-7 and 338-7 ("Defs.' 30(b)(6) Dep.") at 229:16–22, 232:18–25). The claim

submission process begins with the client's transmission of daily "closing files" to

SSIMED. (Defs.' 30(b)(6) Dep. 229:16–22). SSIMED then takes successfully

transmitted closing files and generates claims files to send to insurers through its

clearinghouse. (Burke Dep. at 105:10–16). Insurers may take two to three days to

process the claims. (*Id.* at 104:18–24, 105:17–19). Once processed, claims reports

appear in a tool in Practice Manager known as the "Client Center." (*Id.* at 105:3–19).

The claims reports inform the client whether claims successfully transmitted to insurers

and, if so, whether an insurer paid a particular claim. (McMahon Dep. 115:6–23, 213:5–13).

Claim processing may fail at any stage of the submission process. (Burke Dep. at 94:21–95:15). Certain data-entry errors, such as incorrect diagnosis codes or patient birthdates, may prevent successful transmission of daily closing files to SSIMED, requiring the client to correct the errors. (McMahon Dep. at 115:8–23; Filing No. 324-11, 338-16, 328-6, and 333-11 ("Pierce Dep.") at 44:8–14, 50:18–25, 52:10–17; Harmon Dep. at 38:22–39:12). Some claims might transmit to the insurer but nonetheless "error out." (Burke Dep. at 95:12–15). When a claim fails, a report is generated in the Client Center that informs the client of the claim's status and any submission errors requiring corrections. (*Id.* at 104:18–105:16; McMahon Dep. at 115:15–19). Corrupt files in SSIMED's internal software might also prevent a claim file from generating properly. (Burke Dep. at 10:16–11:3, 16:13–24). Unlike submission errors, glitches from corrupt files require SSIMED—not the client—to troubleshoot the problem. (*Id.* at 11:4–10). Claims with submission errors (i.e., errors on the client's end) remain in the Client Center and unpaid unless they are corrected and resubmitted. (*Id.* at 16:2–12; Harmon Dep. 38:22–39:5, 47:4–48:8).[5]

---

[5] Plaintiffs object to the testimony of Marie Harmon, a billing specialist at Pain Center and PMRC from 2003 to 2010, for lack of foundation. (*See* Filing No. 339 ("Pls.' Br. in Opp'n") at 21–22). Harmon testified that she and Mellencamp worked accounts receivable reports from 2003 to 2007, and that this duty required them to print the reports from the Client Center, correct any errors, resubmit the claims, and, if necessary, make follow-up calls to insurers. (*Id.* at 38:8–39:5, 47:4–25). Plaintiffs note that Harmon never received training on Client Center, and that she could not remember exactly when she first learned about the Client Center (between 2003 and 2007) or specific details concerning customer support calls she made to SSIMED. But these considerations challenge the weight of her testimony, not its admissibility. Plaintiffs do not dispute that Harmon

Pain Center (and later, PMRC) used Practice Manager from 2003 to 2012 and, according to Plaintiffs, experienced problems with the software from the beginning. (Pls.' 30(b)(6) Dep. at 82:11–23). Specifically, Dr. Alexander testified that his entities experienced transmission problems between Pain Center and SSIMED, missing claims, and errors in patient data and billing amounts. (*Id.*). Revenue shortfalls from unpaid claims regularly compelled Plaintiffs to call SSIMED to inquire about the status of claims. (*Id.* at 196:11–24). Dr. Alexander testified that SSIMED repeatedly blamed unpaid claims on the failure or refusal of insurers to pay. (*Id.* at 222:2–6). He further testified that his staff routinely followed up with insurers who, "on numerous occasions, too numerous to even talk about," reported that they had not received claims. (*Id.* at 221:10–222:25).

Another former billing specialist, Demetria Hilton Pierce, joined PMRC in October 2011 and immediately noticed that insurers were not paying all submitted claims. (Pierce Dep. at 242:2–14). When Pierce inquired about the disparity between collections and claims billed, SSIMED directed her to the Client Center where she discovered approximately three thousand unattended claims containing submission errors. (*Id.* at 44:3–14, 44:24–45:4, 49:3–11). SSIMED informed Pierce that no one from PMRC had logged into the Client Center in approximately eighteen months. (*Id.* at 45:16–21). This backlog of uncorrected claims rendered many of them stale, and, despite

---

worked in the billing department or that she accessed and used Practice Manager and "worked reports" from the Client Center. The court finds this foundation more than adequate. Plaintiffs' objection is therefore overruled.

Plaintiffs' subsequent efforts, insurers ultimately denied payment.  (*Id.* at 45:16–21, 49:12–50:22).

Plaintiffs licensed EMRge in 2006 and experienced problems with the software "almost from the beginning," in 2006 or 2007.  (Pls.' 30(b)(6) Dep. at 81:3–9).  A medical records software, EMRge provides a means of inputting and storing patient information electronically.  (*Id.* at 79:5–80:7).  According to Plaintiffs, EMRge frequently dropped certain data inputted during a particular visit, requiring Plaintiffs' staff to reenter the lost information.  (*Id.*).  Consequently, Dr. Alexander instructed his nurses to maintain paper charts and printed screen images from EMRge as a precautionary backup in case of lost data.  (*Id.*).  Plaintiffs do not, however, present evidence that EMRge contributed to the purported losses associated with claim errors or missing claims for payment.

### C.    Plaintiffs' financial problems and investigative efforts

In May 2010, PMRC filed a voluntary petition for Chapter 11 bankruptcy.  (*Id.* at 38:18–39:6).  In a disclosure statement filed on March 3, 2011, PMRC represented that its financial troubles stemmed from its "managers and other staff members . . . mismanaging the business," and that Dr. Alexander "was not aware of this mismanagement until April of 2010."  (*Id.* at 64:1–15).

Between 2003 and 2012, Dr. Alexander made many attempts to discover the source of revenue problems.  He made personnel changes in the billing department, hired an economist to investigate the problem, routinely contacted SSIMED to inquire about unpaid claims, and, subsequently, followed up with insurers about those claims.  (*Id.* at

102:10–23, 221:10–222:12, 335:23–336:4; Filing No. 338-4 ("Dr. Alexander Decl.") ¶ 32). In 2005, Plaintiffs contemplated pursing legal action against certain insurers for failing to honor claims. According to Plaintiffs' counsel, Patrick Harrison, discussions with Plaintiffs continued through 2011, but "sporadic payments" from insurance companies "stymied" their investigation. (Filing No. 338-22 ("Harrison Decl.") ¶ 2; Pls.' 30(b)(6) Dep. at 196:11–21).

According to Plaintiffs, two events in early 2012 caused them to suspect SSIMED as the culprit for their financial distress. (Pls.' 30(b)(6) Dep. at 335:23–337:2). First, Demetria Pierce discovered an abrupt and significant change in PMRC's claims submission history. (Pierce Dep. at 144:10–145:14). Every morning, Pierce provided Dr. Alexander a report generated through Practice Manager that showed PMRC's outstanding claims—that is, claims with errors that required corrections. (*Id.* at 145:18–146:19). One morning in March 2012, Pierce noticed that outstanding claims dropped from approximately $21 million to approximately $15 million. (*Id.* at 144:24–145:3). Pierce inquired with SSIMED, which explained that PMRC had either adjusted its accounts receivable (i.e., write off balances as losses) or received payment. (*Id.* at 146:20–147:7). Pierce testified that PMRC had not received payment and she had not made adjustments to the accounts receivable.[6] (*Id.* at 147:18–148:8).

---

[6] SSIMED objects to the use of Pierce's testimony to establish facts within Plaintiffs' knowledge on grounds that Plaintiffs failed to designate Pierce as a Rule 30(b)(6) representative. (*See* Filing No. 353 at 14). In support, SSIMED merely cites Rule 30(b)(6). The court highly doubts that SSIMED maintains this view with respect to Mellencamp or Harmon, neither of whom represented Plaintiffs as corporate designees. Without so much as an explanation or a relevant citation, the objection is overruled.

The second event giving rise to Plaintiffs' suspicion involved PMRC's "meaningful use" credit. (Pls.' 30(b)(6) Dep. at 205:14–206:12). The government provides financial credit to health care providers who use electronic medical records and billing systems in ways that improve the quality of health care. (*Id.* at 206:13–20). The program credits providers when they counsel patients on the health hazards of smoking. (*Id.* at 206:16–23, 208:3–7). Unsatisfied with the credit PMRC had received, Dr. Alexander sought assistance from SSIMED. (*Id.* at 205:14–22). According to Dr. Alexander, the software's patient questionnaire from which the meaningful use data derives contained a grammatical "double negative," making it difficult for patients to accurately report whether they received counseling for smoking cessation. (*Id.* at 206:16–208:11). Dr. Alexander testified that PMRC had received credit for only five percent of patients, "when [it] should have been getting credit for every patient that came through the door." (*Id.* at 208:14–25). In response to Dr. Alexander's complaint, SSIMED changed the structure of the sentence, boosting PMRC's credit received from five percent to ninety-nine percent of patients. (*Id.* at 207:21–208:2). This interaction, Plaintiffs maintain, alerted them to SSIMED's deceptive practices and the extent to which its software failed to function as advertised. (*Id.* at 205:14–206:12, 207:12–20).

**D. Procedural background**

Plaintiffs commenced this action on January 25, 2013, asserting twelve claims against SSIMED. (Filing No. 16 ("Amended Complaint")). On December 1, 2014, the court dismissed four claims, and Dr. Alexander abandons his claim for intentional infliction of emotional distress. This leaves the following claims for decision on

10

summary judgment: fraud, fraud in the inducement, breach of contract, breach of warranty, fraudulent misrepresentation, and tortious interference with business relations.[7] Plaintiffs root their breach of contract and breach of warranty claims in SSIMED's failure to deliver Practice Manager and EMRge as represented to Plaintiffs. (Amended Complaint ¶ 101). They also claim that SSIMED failed to provide the support, unlimited claim submission, or software upgrades as required in the contracts. (*Id.* ¶ 100). Plaintiffs base their fraud claims on the misrepresentations Deckard made about the functional capabilities of the software and the quality of associated support services SSIMED would provide. Finally, Plaintiffs claim that SSIMED's conduct interfered with their ability to pursue various lucrative business opportunities. Before reaching the merits of the parties' motions, the court must resolve certain evidentiary issues.

## III. Evidentiary Matters

### A. Dr. Alexander's declaration

SSIMED objects to certain portions of Dr. Alexander's declaration as inconsistent with his deposition testimony and therefore inadmissible. A declaration used to oppose summary judgment must be made on personal knowledge and set forth facts that would be admissible in evidence. Fed. R. Civ. P. 56(c)(4). When a party submits its own

---

[7] Plaintiffs assert an additional claim labeled "Breach of Contract/Implied Duty of Good Faith and Fair Dealing," but this claim is duplicative of their breach of contract claim. As SSIMED notes, the implied covenant "does not support an independent cause of action for failure to perform or enforce in good faith. . . . [a]nd does not create a separate duty of fairness and reasonableness which can be independently breached." Ind. Code § 26-1-1-203 (UCC Comment); *Amaya v. Brater*, 981 N.E.2d 1235, 1239 (Ind. Ct. App. 2013) (finding separate breach of implied duty duplicative of breach of contract claim). The court thus considers the two claims as one claim for breach of contract.

declaration to supplement prior deposition testimony, the court disregards any portion of the declaration that conflicts with the prior testimony. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 809 n.1 (7th Cir. 2015); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67–68 (7th Cir. 1995) ("We have been highly critical of efforts to patch up a party's deposition with his own subsequent affidavit."). To avoid exclusion of a conflicting statement, the party advocating its admission must demonstrate that "the statement in the deposition was mistaken . . . ." *Russell*, 51 F.3d at 68.

SSIMED first challenges certain statements in Dr. Alexander's declaration concerning the representations Deckard made to Dr. Alexander in 2003 and again in 2006 about the capabilities of Practice Manager and EMRge, respectively. Dr. Alexander submitted to a Rule 30(b)(6) deposition as the sole corporate representative for Pain Center and PMRC. When asked by his counsel to describe the representations Deckard made with respect to SSIMED's product testing, Dr. Alexander testified that:

> Well, a lot of that had to do with the fact they had thousands of customers, and that those customers had already verified the software. Other things that they said that were extremely misleading was that they have been involved in pain management, and that their software package was ready to go for a pain practice. Other things that they said that I found lacking was that these two packages [Practice Manager and EMRge] would work seamlessly together.

(Pls.' 30(b)(6) Dep. at 324:12–24). Plaintiffs' counsel then clarified the focus of his question to Practice Manager, and Dr. Alexander responded that the "Practice Manager software was supposed to allow me to be freed up." (*Id.* at 324:25–325:5). Dr. Alexander described subsequent conversations with Deckard as follows:

> [I]n terms of a conversation with [Deckard], only in passing in the hallway, I would say "this [Practice Manager] ain't working." . . .   And she would be headed to see Miss Mellencamp.  And I'd have to see patients.
> . . . .
> And I'd say, well, you know, we're not getting our claims paid.  She said, "Oh, yeah, we're working on a project called EMRge.  And when EMRge comes out, they're going to merge together.  And the two of them together are going to make sure you're paid a whole lot better.  You know, we got some problems here.  We recognize those problems here and . . . we're fixing it all the time.  You just need to get a [help desk] ticket.  Call out and get a ticket and make sure that people know you're having problems."

(*Id.* at 327:9–328:7 (alterations added)).  Elsewhere in his deposition, Dr. Alexander testified that Deckard represented Practice Manager as a software and support package that would obviate the need for his staff to interact with insurers.  (*Id.* at 221:1–14).

Paragraphs 3 through 10 of Dr. Alexander's declaration attempt to supplement his prior testimony regarding Deckard's representations and lay the foundation for Plaintiffs' reliance on her statements.  For instance, according to the declaration, Deckard represented that Plaintiffs would enjoy a "seamless transition to a new software package . . . because [SSIMED] had substantial experience in anesthesia and pain management billing"; that the software and support package "had the capability to make timely recommendations and/or corrections to prevent the financial losses [Plaintiffs] eventually suffered"; that SSIMED "had a quality assurance department that monitored claims and software bugs for clients"; and that SSIMED had thousands of customers using Practice Manager.  (Dr. Alexander Decl. ¶ 3–6).  Although these statements

13

certainly augment Dr. Alexander's deposition testimony, using a declaration to pad prior testimony with additional detail does not put the testimonies in conflict.

The court finds differently with respect to Plaintiffs' attempt to generate a dispute of fact on the issue of Client Center training. In his declaration, Dr. Alexander states that "[he] was trained at [his] office by Amy Kiernan" and that she "did not instruct [him] or [his] staff about any 'client center' functionality and as a result, I didn't learn of this key functionality until 2012." (*Id.* ¶ 11). However, when asked during the deposition to describe the training on Practice Manager, Dr. Alexander could not recall the name of SSIMED's trainer, whether all or any of his staff members received training on any particular aspect of the software, nor whether the training was completed as scheduled. (Pls.' 30(b)(6) Dep. at 84:10–86:25). This failure to recall any substantive detail about the training conflicts considerably with his subsequent certitude, expressed in the declaration, as to the substance of not only his personal training session but also the training provided to his staff. Plaintiffs do not explain the inconsistency. The court therefore disregards this portion of the declaration.

## B.     Reid's declaration

Plaintiffs designate the declaration of Eleanor Reid, owner of Reid & Company LLC. Reid, a fact witness, testifies that Plaintiffs recruited her "to examine whether Plaintiffs' [sic] were losing money due to Defendants' software/support services around the spring 2012 up through the fall of 2012 and, if so, how much." (Filing No. 338-23 ("Reid Decl.") ¶ 3). She explains her methodology as follows:

I logged onto Defendants' software and compared the amounts collected from patients against the percentage expected with no credit given to the reasons Defendants claimed the payments were not issued.

By ignoring the reasons provided, I was able to use the amounts to determine whether the losses appeared to be related to Defendants. If for example, there were hardly any "losses" then the reasons Defendants provided would have been more plausible.

(*Id.* ¶¶ 5–6). Reid concluded from her review that Plaintiffs lost roughly $15,000,000 in non-submitted claims. (*Id.* ¶¶ 7–8).

SSIMED challenges Reid's testimony on grounds that it constitutes expert testimony that relies on inadmissible hearsay. A witness not disclosed as an expert pursuant to Federal Rule of Civil Procedure 26(a)(2)—such as Reid—may testify only from his or her own personal knowledge. Fed. R. Evid. 602; *Ani-Deng v. Jeffboat, LLC*, 777 F.3d 452, 454 (7th Cir. 2015). Although personal knowledge includes inferences and therefore opinions, such opinions must have a basis in observation or other firsthand personal experience. *Id.*; *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991).

Plaintiffs argue that Reid's firsthand review of the claims history in Practice Manager establishes her personal knowledge to testify on the issue of causation. This view lacks the slightest merit. Reid's declaration lays no foundation to suggest that she has firsthand knowledge of Practice Manager, billing software generally, the claim submission process, or even the health care industry. *See Von der Ruhr v. Immtech Intern., Inc.*, 570 F.3d 858, 864 (7th Cir. 2009) (prohibiting lay witness opinion testimony

formed entirely upon information provided to the witness).  Her conclusion rests entirely on the percentage of "expected" claims—presumably provided by Dr. Alexander—and the data provided to her through remote access to Practice Manager.  As such, the court finds Reid's testimony inadmissible.

## C.    Anderson's expert report

Plaintiffs retained Mark R. Anderson, an information technology ("IT") health care futurist, to evaluate Practice Manager and EMRge and the associated support services to determine whether SSIMED caused lost or non-submitted claims.  (Filing No. 338-25 ("Anderson Report & Decl.") at 21).  To the extent Anderson opines on the software as the cause of unpaid claims, SSIMED objects to the admissibility of his opinion on grounds that he lacks sufficient qualifications.  Plaintiffs contend that they need not present expert testimony on causation because, as a matter of contract interpretation, SSIMED—not Plaintiffs—bore responsibility to follow through on claims stuck in the Client Center.  Throughout their materials, however, Plaintiffs repeatedly cite "software bugs" and "glitches" as suspected culprits behind the unpaid claims.  (*See, e.g.*, Filing No. 326 at 5–7; Filing No. 355 at 4, 16–17; Pls.' Br. in Opp'n at 3–4; Pls.' 30(b)(6) Dep. at 203:23–204:11 ("Q: What specific glitch in the SSIMED software caused the Pain Center to lose money?  Counsel: Objection.  Calls for expert testimony.  A: I agree. There were lots of glitches, and I can't point to exactly one that would cause us to lose money.  I think all of them together caused us to lose money.").  The interest of completeness therefore merits brief discussion of SSIMED's objection to Anderson's report.

Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) govern the admissibility of expert testimony. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). In deciding whether to admit expert testimony, the court engages in a three-step inquiry. *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). The court must (1) determine whether the witness is qualified as an expert; (2) evaluate the scientific reliability of the expert's methodology; and (3) "determine whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (internal quotation marks omitted).

Anderson has forty-three years of experience in health care IT. He has evaluated over three hundred software products for functionality, workflow, processes, screen design, and interface to determine whether software meets national revenue cycle management ("RCM") standards and generally accepted accounting principles ("GAAP"). Anderson does not claim to have experience in software engineering or programming; nor does he opine on specific glitches in SSIMED's software that prevented the payment of claims. (Anderson Report & Decl. at 6). In fact, Anderson has no experience as a user of either Practice Manager or EMRge. (*Id.* at 5–6).

Anderson nonetheless finds SSIMED's software deficient and therefore a cause of lost or non-submitted claims because the number of claims Dr. Alexander believes his practice submitted far exceeds the number on record with SSIMED. (*Id.* at 34). He also cites the drastic increase in successfully processed claims since Plaintiffs switched to another practice management software. In other words, the magnitude of the disparity

between the two numbers speaks for itself.  (*Id.* at 6–7 ("A common lay person does not need to be a software programming expert to know that the number of claims successfully processed by year does not vary from 1,955 the first six years to 8,500 the final two years to over 11,000 once a practice switches from one software to another.").  To arrive at his conclusion, however, Anderson improperly eliminates another plausible explanation: the failure of Plaintiffs to follow up on claims stuck in the Client Center.  Based on his experience reviewing hundreds of practice management contracts, Anderson concludes that the Practice Manager and EMRge contracts charged SSIMED with responsibility to ensure the payment of claims.  (*Id.* at 46).  But the court disregards such expert testimony that amounts to nothing more than a legal conclusion.  *See Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003).  Therefore, to the extent Anderson concludes that software defects—as opposed to poor functionality or interface—caused Plaintiffs' damages, the court finds Anderson unqualified to render such opinions and thus excludes them from consideration.

IV.    **Discussion**

Because the parties' motions substantially overlap in substance, the court addresses the issues together bearing in mind the court's duty to view facts and draw inferences in the nonmoving party's favor.  *See Calumet River Fleeting, Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 824 F.3d 645, 647–48 (7th Cir. 2016).

As the parties appear to recognize in their materials, the survival of Plaintiffs' claims turns first on whether they are time barred.  Generally, a district court sitting in diversity applies the choice of law rules of the state in which it sits.  *Jackson v. Payday*

18

*Fin., LLC*, 764 F.3d 765, 774 (7th Cir. 2014). Notwithstanding any contractual choice of law provisions, Indiana law governs procedure. *Smither v. Asset Acceptance, LLC*, 919 N.E.2d 1153, 1157–58 (Ind. Ct. App. 2010). Because statutes of limitations place time constraints on when suit may be filed, Indiana's statutes govern Plaintiffs' claims. *Id.* at 1158. Plaintiffs seek to avoid the applicable statutes of limitations on grounds that material disputes of fact remain that bear on the doctrines of fraudulent concealment and continuing wrong.

### A. Statute of limitations—Breach of contract and breach of warranty

SSIMED argues that the four-year statute of limitations provided in Article 2 of the Uniform Commercial Code ("UCC"), as enacted in Indiana, applies to Plaintiffs' breach of contract and breach of warranty claims. *See* Ind. Code § 26-1-2-725(1). Plaintiffs counter, without a citation or explanation, that Indiana's ten-year limitations period applies. (Filing No. 355 at 10; Pls.' Br. in Opp'n at 8); *see* Ind. Code § 34-11-2-11 (providing ten-year limitation period for contracts in writing *other than those for the payment of money*, such as mortgages). The court presumes that Plaintiffs intend to invoke Indiana's six-year statute of limitations for contracts for the payment of money, as provided by Indiana Code § 34-11-2-9. *See Aigner v. Cass Sch. Twp. of LaPorte Cty.*, 577 N.E.2d 983, 986 (Ind. Ct. App. 1991).

When a contract is "mixed" and thus involves both the provision of goods and the performance of services, the court must determine whether the contract falls within Indiana's UCC or the general six-year statute. *Insul–Mark Midwest, Inc. v. Modern Materials, Inc.*, 612 N.E.2d 550, 553–54 (Ind. 1993). Here, both the Practice Manager

and the EMRge contracts involve not just the software but also support services, such as unlimited telephone and online support, standard software upgrades, unlimited claim submission to designated payers, and the printing and mailing of claims and statements. (Filing No. 338-1 ("Agreements") at 2, 4).   Indiana courts use the "predominant thrust test" to determine whether a mixed contract is subject to the UCC's four-year statute of limitations.  Under this test, "the applicability of the U.C.C. to a mixed transaction is determined by considering whether the transaction's predominant factor, its thrust, its purpose, reasonably stated, is the rendition of service, with goods incidentally involved . . . or is a transaction of sale, with labor incidentally involved." *Insul-Mark Midwest, Inc.*, 612 N.E.2d at 554 (quoting *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974)) (internal quotation marks and alterations omitted).

In cases involving a contract for the sale of prepackaged software not specifically developed for the buyer, the Indiana Court of Appeals has found such transactions to constitute sales of goods.  *Olcott Int'l & Co. v. Micro Data Base Sys., Inc.*, 793 N.E.2d 1063, 1071 (Ind. Ct. App. 2003); *see also Data Processing Servs., Inc. v. L.H. Smith Oil Corp.*, 492 N.E.2d 314, 318–19 (Ind. Ct. App. 1986) (distinguishing a contract for development of a system to meet specific needs of buyer from the purchase of prepackaged software with incidental services, such as employee training, repair services, and system upgrading), *rev'd on other grounds*, *Insul-Mark Midwest, Inc.*, 612 N.E.2d at 554.  Plaintiffs first suggest that SSIMED developed Practice Manager specifically for Plaintiffs, citing Dr. Alexander's post-purchase request for "meaningful use" programing. But subsequently adding a new capability or an upgrade to Practice Manager does not

change the nature of the transaction. The contract even contemplates "custom programming," upon the buyer's request, "at the current hourly rate" or "priced on a per project basis." (Agreements at 2, 4).

Plaintiffs also argue that SSIMED's claim submission to individual insurers renders the transaction predominately one for services. In support, they point to the conclusion of their expert, Mark R. Anderson, that the Practice Manager contract required SSIMED to ensure that all claims successfully made it through the clearinghouse system—meaning, all claims reached the insurers without error. (Filing No. 338-25 ("Anderson Report") at 31). Anderson's conclusion and related testimony is inadmissible, however, because it amounts to a legal conclusion that determines an ultimate issue in this case. *Good Shepherd Manor Found.*, 323 F.3d at 564.

Plaintiffs further claim that the mandatory service provisions—data conversion, monthly services and support, claim submission, and onsite training—outweigh the mere licensing of Practice Manager and EMRge. The relative costs associated with the software and services indicate otherwise. The contract price for Practice Manager is $8,000, compared to $225 per month for services and support; the contract price for EMRge is $23,275, compared to $284 per month for services. (Agreements at 1, 3). Unlike SSIMED's full-service clients, who rely on SSIMED to manage billing, Plaintiffs licensed the software but retained ultimate control over their billing operation. (*See* Burke Dep. at 16:1–8). Thus, the software, and not the incidental services rendered in conjunction with the software, predominated the transactions. As such, the court finds that Plaintiffs' claims arising from the contracts fall under the UCC.

An action for breach of contract under the UCC must commence within four years after the cause of action accrues. Ind. Code § 26-1-2-725(1). "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." *Id.* § 26-1-2-725(2). A claim for breach of warranty accrues "when tender of delivery is made," unless the contract expressly extends the warranty to future performance of the goods. *Id.*

Plaintiffs describe several ways in which SSIMED breached the Practice Manager contract, but ultimately this case comes down to unpaid claims. Thus, when Plaintiffs charge SSIMED with failure to adequately train Plaintiffs on the Client Center, provide the necessary support services, or timely update the software, Plaintiffs point to such breaches as contributing to the problems with claim submissions. Dr. Alexander testified that Pain Center first experienced serious problems with the software in 2003, including failed claim transmissions between Pain Center and SSIMED, lost claims, and errors in billing and patient data. Likewise, he testified that EMRge routinely produced errors in patient data near the beginning of the contract in 2007. Therefore, Plaintiffs claims arising under the contracts accrued in 2003 and 2007, respectively. Absent an applicable tolling doctrine, the limitations period on Plaintiffs' breach of contract and breach of warranty claims arising from the Practice Manager and EMRge contracts expired in 2007 and 2011, respectively.

### 1.    Fraudulent concealment

Plaintiffs argue that, even if the statute of limitations has run on their claims, the doctrine of fraudulent concealment should allow them to proceed on breach of contract and breach of warranty.  As codified, the doctrine provides:

> [i]f a person liable to an action conceals the fact from the knowledge of the person entitled to bring the action, the action may be brought at any time within the period of limitation after the discovery of the cause of action.

Ind. Code § 34-11-5-1.  This doctrine operates to "estop a defendant from asserting the statute of limitations when he has, either by deception or by a violation of duty, concealed from the plaintiff material facts, thereby preventing the plaintiff from discovering a potential cause of action."  *Horn v. A.O. Smith Corp.*, 50 F.3d 1365, 1372 (7th Cir. 1995) (quoting *Fager v. Hundt*, 610 N.E.2d 246, 251 (Ind. 1993)) (internal quotation marks and alterations omitted).  To invoke fraudulent concealment, the complaining party must show that the wrongdoer committed affirmative acts designed to conceal the cause of action, unless the parties have a relationship that gives rise to a special duty.  *See Morfin v. Estate of Martinez*, 831 N.E.2d 791, 802 (Ind. Ct. App. 2005); *see also Lyons v. Richmond Cmty. Sch. Corp.*, 19 N.E.3d 254, 260–61 (Ind. 2014) (distinguishing between active and passive, or constructive, fraud).

Plaintiffs cite a buyer-seller relationship as a basis for a duty owed by SSIMED. A buyer-seller relationship may impose such a duty upon a seller where he or she has exclusive possession of certain knowledge and thus an advantage over the buyer.  *Id.*  For this duty to arise, the seller must "induce another to make a purchase, the buyer relies on

those statements, and the seller has professed knowledge of the truth of the statements."

*Yeager v. McManama*, 874 N.E.2d 629, 642 (Ind. Ct. App. 2007).  According to Dr.

Alexander's testimony, he relied on Deckard's assurance that the combination of

software and support services would prevent the lost or unpaid claims that Plaintiffs

purportedly suffered.[8]  He further testifies that he relied on this statement, *inter alia*,

when deciding to purchase Practice Manager over other practice management software.

Notwithstanding a buyer-seller relationship, the undisputed evidence forecloses

any benefit of the fraudulent concealment doctrine to Plaintiffs.  "When a plaintiff learns

of information that would lead to the discovery of the cause of action through diligence,

the statute of limitations begins to run, regardless of concealment."  *Miller v. A.H. Robins*

*Co.*, 766 F.2d 1106–07 (7th Cir. 1985) (quoting *Adams v. Luros*, 406 N.E.2d 1199, 1203

(Ind. Ct. App. 1980)).  Plaintiffs experienced problems with claim submissions through

Practice Manager as early as 2003.  Dr. Alexander testified that in response to unpaid

claims, his billing staff routinely "followed up with a phone call [to] the insurers to find

out where the claims were," and that insurers denied having received any claims.  (Pls.'

30(b)(6) Dep. at 222:2–12).  Similarly, he testified that EMRge failed to function

properly soon after incorporating that software into his practice.  Harmon, one of

---

[8]  As discussed further below, Plaintiffs accuse SSIMED of several other misrepresentations but simply fail to present evidence to establish their falsity.  For example, Plaintiffs state that Deckard misrepresented that SSIMED had thousands of providers who used Practice Manager, but Plaintiffs fail to establish this as false or misleading.  Plaintiffs' own evidence suggests that although SSIMED had approximately two hundred clients, each client had an average of approximately ten providers.  (Filing Nos. 324-6 and 338-14 ("Vandenberg Dep.") at 200:5–201:24; Filing No. 338-19 at 14).  Plaintiffs may not rely on manufactured ambiguities in the record to defeat summary judgment.

Plaintiffs' former billing specialists, testified that Dr. Alexander often complained about SSIMED "throughout the years," and as early as 2004. (Harmon Dep. at 97:7–20; *see also* Filing No. 324-12 ("Maxie Dep.") at 69:6–20).

Plaintiffs, however, resist the time bar on grounds that they had no knowledge of the precise causes of lost claims. In support, Plaintiffs provide two unsatisfactory explanations: First, SSIMED intentionally misled Plaintiffs to believe that the claim submission process ended once they successfully transmitted closing files to SSIMED. In other words, Plaintiffs fault SSIMED for the claims with errors that remained unattended in the Client Center. Dr. Alexander maintains that he did not even learn about the Client Center until 2012. Relatedly, Plaintiffs claim breach of contract on grounds that SSIMED did not adequately train Dr. Alexander or Pain Center's billing staff on the process of obtaining reports and correcting claims in the Client Center. This is of no moment, however, because the undisputed evidence establishes that Plaintiffs' staff had accessed the Client Center and "worked claims" throughout the contract.[9] When Demetria Hilton Pierce took over billing at PMRC in October 2011, she learned that

---

[9] This conclusion also applies to Plaintiffs' claim that SSIMED fraudulently blamed insurance companies for unpaid claims. The evidence establishes, rather, that insurers indeed rejected claims and that those claims remained in the Client Center until Plaintiffs' staff made the necessary corrections. (*See, e.g.*, Harmon Dep. at 38:22–39:12 ("Q: Do you remember what you did to work the [accounts receivable] with the SSIMED products? A: Yes. We would print the report, and if anything was over . . . 45 days, I'd work on it. I would only re-bill once, but then I would get on the phone and call the insurance company to see what was going on. I do remember we had a lot of issues with Anthem paying for a lot of the injections. They were not wanting to pay anything for those. We had a big issue for a long time with that . . . .")).

although no one from PMRC had logged into Client Center in approximately eighteen months, someone had previously accessed it and worked claims flagged with errors.

Second, Plaintiffs blame unspecified "glitches" in the software that prevented claims from reaching insurers. Plaintiffs rely on the testimony of Jennifer Burke, who worked in SSIMED's "operations group," to establish that SSIMED's own "back end" software or processes prevented Plaintiffs' claims from reaching insurers. But Burke merely testified that SSIMED periodically received corrupt files from clients that could "throw everything off," requiring her to troubleshoot the problem. (Burke Dep. at 10:16–11:6, 16:9–24, 31:15–25). Plaintiffs marshal no evidence that connects such errors to Plaintiffs' claims specifically, or that SSIMED failed to remedy corrupt files to ensure that affected claims were properly submitted. On summary judgment, the court does not draw inferences "supported by only speculation or conjecture." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (quotations marks omitted).

Even if Plaintiffs had presented sufficient evidence to generate a dispute of fact on causation, Plaintiffs cannot avoid the statute of limitations because they had sufficient knowledge of a potential claim against SSIMED. "For a cause of action to accrue [for limitations purposes], it is not necessary that the full extent of the damage be known or even ascertainable but only that some ascertainable damage has occurred." *Doe v. United Methodist Church*, 673 N.E.2d 839, 842 (Ind. Ct. App. 1996). The inquiry is whether the plaintiff "knew, or in the exercise of ordinary diligence, could have discovered," a breach of contract. *Meisenhelder v. Zipp Express, Inc.*, 788 N.E.2d 924, 930 (Ind. Ct. App. 2003). Three actors participated in the claims submission process: the provider

(Plaintiffs), SSIMED, and the insurer.  Throughout the life of the contract, Plaintiffs

routinely inquired with insurers about unpaid claims; and, according to Dr. Alexander,

insurers often denied that they received the claims.  On this evidence alone, Plaintiffs

should have deduced that a potential cause of action stemmed from the only other

possible culprit—SSIMED.

### 2. Continuing wrong

In the alternative, Plaintiffs argue that the doctrine of continuing wrong rescues

their breach of contract claim.  Indiana recognizes two ways in which the continuing

wrong doctrine applies:

> The first includes cases in which the original [wrong] occurred
> outside the statute of limitations, but is closely related to other
> [wrongs] that are not time-barred.  In such cases, recovery may
> be had for all [wrongs], on the theory that they are part of one,
> continuing [wrong].
>
> The second type of continuing [wrong] is one in which an
> initial [wrong], outside the statute of limitations, is repeated
> later; in this case, each [wrong] begins the limitation period
> anew, and recovery may be had for at least those [wrongs] that
> occurred within the period of limitations.

*Marion Cty. v. Indiana*, 888 N.E.2d 292, 298 (Ind. Ct. App. 2008) (considering the effect

of continuing constitutional violations) (citation omitted).  Plaintiffs attempt to benefit

from the first category.  In support, they argue that Defendants (1) "continuously failed to

process Plaintiffs' claims throughout the relevant time period (2003–2012)" and (2)

"continually misrepresented their size and technical capabilities" and that "no software

bugs affect[ed] claims reimbursement."  (Pls.' Br. in Opp'n at 19).  Accordingly, the

argument goes, "the statute of limitations should run at the end of the continuing

wrongful act." (*Id.*). Plaintiffs do not develop this argument any further and the court declines to advocate on their behalf. In any event, the doctrine of continuing wrong is an equitable doctrine and will not salvage an otherwise time-barred claim if the plaintiff knew or should have discovered the cause of action within the limitation period. *C&E Corp. v. Ramco Indus., Inc.*, 717 N.E.2d 642, 645 (Ind. Ct. App. 1999).

The court concludes that no equitable exception to the statute of limitations applies to Plaintiffs' claims for breach of contract and breach of warranty. Accordingly, the court grants SSIMED's motion for summary judgment as to those claims.

**B.     Statute of limitations—tort claims**

Counts I, II, and VII charge SSIMED with fraud, fraud in the inducement, and fraudulent misrepresentation, respectively. Claims sounding in fraud fall under Indiana Code § 34-11-2-7(4), which provides a six-year statute of limitations. "A tort claim accrues and the statute of limitations thus begins to run when the plaintiff knew or, in the exercise of ordinary diligence, should have discovered that an injury had been sustained as a result of the tortious act of another." *LaCava v. LaCava*, 907 N.E.2d 154, 162 (Ind. Ct. App. 2009). Plaintiffs' admission that neither Practice Manager nor EMRge functioned properly from the beginning means the limitations period on Plaintiffs' fraud claims expired in 2008 for Practice Manager and in 2012 for EMRge. Because this action commenced in 2013, Plaintiffs' fraud claims are time barred unless an equitable exception applies.

Plaintiffs again rely on the fraudulent concealment arguments presented in support of their breach of contract claim. According to Plaintiffs, Deckard misrepresented the

functional capabilities of both Practice Manager and EMRge and the associated support services.[10]  Dr. Alexander claims that based on Deckard's representations, he believed his staff's role in the claim submission process ended once claims successfully transmitted to SSIMED.  He also believed that SSIMED would monitor the status of claims and notify Plaintiffs of any errors preventing payment.  Dr. Alexander claims he had no knowledge of Client Center until 2012, when he suddenly realized he did not receive payment for thousands of claims worth millions of dollars.  Again, even assuming the truth of this assertion, the undisputed evidence shows that Plaintiffs' staff had accessed and used the Client Center throughout the life of the contract.  Thus, Dr. Alexander's reliance on purported misrepresentations has no consequence here.  Accordingly, the statute of limitations bars Plaintiffs' claims sounding in fraud.

Finally, SSIMED moves for summary judgment on Count XI for tortious interference with business relations on grounds that it is barred by Indiana's two-year statute of limitations.  *See Graves v. Kovacs*, 990 N.E.2d 972, 977–78 (Ind. Ct. App. 2013); Ind. Code § 34-11-2-4(a).  Dr. Alexander testified that the failure of the software created financial turmoil for Plaintiffs and interfered with the following business opportunities:

---

[10]  The undisputed evidence establishes that Deckard made certain representations in 2003, when she sold Practice Manager to Plaintiffs, and again in 2006 when she sold EMRge.  In a single sentence followed by a string citation to multiple exhibits, Plaintiffs assert that SSIMED "actively and intentionally misled Plaintiffs regarding their size and capabilities, and the status of claims throughout the relevant time frame."  (Pls.' Br. in Opp'n at 14).  Plaintiffs neither elaborate on this bald allegation—presumably tossed in the mix to show ongoing fraud—nor bother to explain the relevance of the evidence cited.  The court generously reviewed the citations, and the evidence cited simply fails to support the allegation.

1. Dr. Norman McCoomer, a colleague of Dr. Alexander, left Pain Center in 2007 because it could not pay his salary. (Pls.' 30(b)(6) Dep. at 169:15–21).

2. Dr. Alexander could not invest in joint ventures in 2007 and 2008 due to revenue shortfalls (*Id.* at 169:22–25, 172:1–5).

3. Dr. Alexander could not obtain financing to purchase MRI units for his practice. (*Id.* at 170:1–4).

4. In 2005 or 2006, Dr. Alexander could not participate in a joint venture with St. Vincent's Hospital. (*Id.* at 170:5–12, 174:23–175:6).

5. In 2009 or 2010, Dr. Alexander decided not to execute plans to build a surgery center in his facility because low collections made it financially unfeasible. (*Id.* at 170:16–21, 176:3–20).

Dr. Alexander also testified that he could not complete a patent application for a device he promoted in 2008 and 2009. (*Id.* at 170:21, 252:22–253:23). As SSIMED notes, however, Dr. Alexander never made SSIMED aware of this business opportunity and therefore cannot hold it liable on a theory of tortious interference. *See Gov't Payment Serv. Inc. v. Ace Bail Bonds*, 854 N.E.2d 1205, 1209 (Ind. Ct. App. 2006) (requiring the defendant's knowledge of a business relationship as an essential element of tortious interference).

As early as 2005, Dr. Alexander informed SSIMED of the joint venture with St. Vincent's Hospital and the need for payment on unpaid claims in Practice Manager. (*Id.* at 173:1–3, 174:23–175:6). This, SSIMED argues, establishes that Plaintiffs had knowledge of a potential claim as early as 2005. Plaintiffs resist this conclusion, arguing that knowledge of unpaid claims does not amount to knowledge that SSIMED caused the

claims to remain unpaid.  In support, "Plaintiffs reiterate all their arguments regarding tolling of the statute of limitations."  (Pls.' Br. in Opp'n at 27).  Accordingly, for the reasons set forth above with respect to Plaintiffs' contract and fraud claims, the court similarly finds the tortious interference claim time barred.

## V.     Conclusion

For the foregoing reasons, the court **GRANTS** SSIMED's Motion for Summary Judgment (Filing No. 322), and **DENIES** Plaintiffs' Motion for Partial Summary Judgment (Filing No. 325).  The court further **DENIES as MOOT** Plaintiffs' motion to strike SSIMED's surreply to Plaintiffs' Motion for Partial Summary Judgment (Filing No. 349).  Final judgment consistent with this Entry shall now issue.


**SO ORDERED** this 24th day of January 2017.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana




Distributed Electronically to Registered Counsel of Record.